# APPENDIX-2

1.  Category_Psychological abuse - Wikipedia.pdf (p.1-3)
2.  Abusive_power_and_control.pdf (p.4-18)
3.  Abuse of Epidemiology_ - HB Litigation Conferences.pdf (p.19-30)
4.  Abusive Litigation.pdf (p.34-37)
5.  Emotional blackmail - Wikipedia.pdf (p.35-39)
6.  Obfuscation - Wikipedia.pdf (p.40-43)
7.  Victim_playing.pdf (p.43-45)
8.  Victim_mentality.pdf (p.46-52)
9.  The Victim Mentality – COLORFUL CHAOS THE JOURNEY.pdf (p.53)
10. Litigation Abuse _ WomensLaw.org.pdf (p.54-56)
11. Love, lies and...fraud_ Understanding civil fraud lawsuits _
Piro Zinna Cifelli Paris & Genitempo LLC.pdf (p.57-68)

Case 2:21-cv-01316-MJP    Document 1-3    Filed 09/27/21    Page 2 of 74

WIKIPEDIA

# Category:Psychological abuse

*The main article for this category is **Psychological abuse**.*
*See also: Category:Domestic violence*

## Subcategories

This category has the following 5 subcategories, out of 5 total.

**B**

► Blacklisting (14 C, 32 P)
► Bullying (16 C, 118 P)

**C**

► Coercion (2 C, 11 P)

**M**

► Psychological manipulation (4 C, 64 P)

**P**

► Psychological torture techniques (1 C, 16 P)

## Pages in category "Psychological abuse"

The following 55 pages are in this category, out of 55 total. This list may not reflect recent changes (learn more).

- Psychological abuse

- Emotional dysregulation

## A

- Abusive power and control
- Abusive supervision
- Murder of Anthony Avalos

## B

- Bashing (pejorative)
- Betrayal
- Brainwashing
- Bullying

## C

- Character assassination
- Coercion
- Control by deprivation
- Control freak
- Covert incest

## D

- DARVO
- Destabilisation
- Duluth model

## E

- Embarrassment
- Emotional blackmail

## F

- Murder of Gabriel Fernandez

## G

- Gaslighting
- Ghosting (relationships)
- Guilt trip

## H

- Humiliation

## I

- Institutional betrayal
- Intimidation
- Isolation to facilitate abuse

## J

- Just-world hypothesis

## K

- Masaki Kito

## L

- Murder of Sylvia Likens
- Lissette Ochoa domestic violence case

Case 2:21-cv-01316-MJP    Document 1-3    Filed 09/27/21    Page 4 of 74

## M

- Madonna–whore complex
- Mind games
- Moving the goalposts
- Music in psychological operations

## O

- Obfuscation

## P

- Parentification
- Passive-aggressive behavior
- Psychological subversion
- Psychological torture
- Psychology of torture

## R

- Revenge porn

## S

## Setting up to fail

- Silent treatment
- Social undermining
- Splitting (psychology)
- Structural abuse
- Suggestibility

## T

- Threat
- Triangulation (psychology)

## V

- Verbal abuse
- Victim blaming
- Victim playing

## W

- Richard Warshak

## Y

- Suicide of Kelly Yeomans

---

Retrieved from "https://en.wikipedia.org/w/index.php?title=Category:Psychological_abuse&oldid=953110055"

---

**This page was last edited on 25 April 2020, at 19:12 (UTC).**

Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

WIKIPEDIA

# Abusive power and control

**Abusive power and control** (also **controlling behavior** and **coercive control**) is commonly used by an abusive person to gain and maintain power and control over another person in order to subject that victim to psychological, physical, sexual, or financial abuse. The motivations of the abuser are varied and can include devaluation, envy, personal gain, personal gratification, psychological projection, or just for the sake of the enjoyment of exercising power and control.[1]

Controlling abusers use tactics to exert power and control over their victims. The tactics themselves are psychologically and sometimes physically abusive. Control may be exerted through economic abuse, limiting the victim, as they may not have the means to resist or leave the abuse.[2] The goal of the abuser is to control, intimidate, and influence the victim to feel they do not have an equal voice in the relationship.[3]

Manipulators and abusers often control their victims with a range of tactics, including, but not limited to, positive reinforcement (such as praise, superficial charm, flattery, ingratiation, love bombing, smiling, gifts, attention), negative reinforcement (taking away aversive tasks or items), intermittent or partial reinforcement, psychological punishment (such as nagging, silent treatment, swearing, threats, intimidation, emotional blackmail, guilt trips, inattention) and traumatic tactics (such as verbal abuse or explosive anger).[4]

The vulnerabilities of the victim are exploited with those who are particularly vulnerable being most often selected as targets.[4][5][6] Traumatic bonding (also popularly known as Stockholm syndrome) can occur between the abuser and victim as the result of ongoing cycles of abuse in which the intermittent reinforcement of reward and punishment creates powerful emotional bonds that are resistant to change and a climate of fear.[7] An attempt may be made to normalise, legitimise, rationalise, deny, or minimise the abusive behaviour, or blame the victim for it.[8][9][10]

Isolation, gaslighting, mind games, lying, disinformation, propaganda, destabilisation, brainwashing, and divide and rule are other strategies that are often used. The victim may be plied with alcohol or drugs or deprived of sleep to help disorientate them.[11][12] Based on statistical evidence, certain personality disorders correlate with abusive tendencies of individuals with those specific personality disorders when also compiled with abusive childhoods themselves. [13]

The seriousness of coercive control in modern Western societies has been increasingly realised with changes to the law in several countries so it is a definable criminal offence. In conjunction with this there have been increased attempts by the legal establishment to understand the characteristics and effects of coercive control in legal terminology. For example, on January 1, 2019, Ireland enacted the Domestic Violence Act 2018, which allowed for the practice of coercive control to be identifiable based upon its effects on the victim. And on this basis defining it as: 'any evidence of deterioration in the physical, psychological, or emotional welfare of the applicant or a dependent person which is caused directly by fear of the behaviour of the respondent'.[14] On a similar basis of attempting to understand and stop the widespread practice of coercive control, in 2019, the UK government made teaching about what coercive control was a mandatory part of the education syllabus on relationships.[15] While coercive control is often considered in the context of an existing intimate relationship, when it is used to elicit a sexual encounter it is legally considered as being a constituent part of sexual abuse or rape. When it is used to begin and maintain a longer term intimate relationship it is considered to be a constituent element of sexual slavery.

# Contents

**Institutional abuse**

**Law**

**Caring professions**

**Intimate partner abuse**

    Background

    Control development

    Tactics

        Coercion and threats

        Intimidation

        Economic abuse

        Emotional abuse

        Isolation

        Minimizing, denying, and blaming

        Using children and pets

        Using privilege

**Psychological warfare**

    Zersetzung

**Serial killers**

**In the workplace**

    Workplace psychopaths

**Personality psychology**

**Psychological manipulation**

    Emotional blackmail

    Silent treatment

    Love bombing

    Mind games

    Divide and conquer

**Human trafficking**

**Oppression**

**Bullying**

**Controlling and coercive behavior**

**See also**

**References**

**External links**

## Institutional abuse

Institutional abuse which is also known as organizational abuse,[16] is the maltreatment of a person (often children or older adults) from a system of power.[17] This can range from acts similar to home-based child abuse, such as neglect, physical and sexual abuse, and starvation, to the effects of assistance programs working below acceptable service standards, or relying on harsh or unfair ways to modify behavior.[17] Institutional

abuse can take many different forms, some of them very small. An example of a small instance is insisting that the person in their care eat their meal or have their snack at the same time everyday, even when they do not want to.

**Forms of Institutional abuse**[16]

- improper use of power
- improper use of control
- improper use of restraints
- Taking away choices
- Lack of personal possessions (clothing, items, trinkets, etc.)
- No flexibility with schedules, particularly at bed time
- financial abuse
- physical abuse
- verbal abuse
- psychological abuse

**Signs of Institutional abuse**[16]

- an unhygienic environment
- an unsafe environment
- rigid schedule
- No privacy, respect, or dignity as a person
- isolating from family and community
- Lack of choices with food, activities, etc.
- absence of respect for religion, cultural background, or beliefs
- treating adults as children, particularly in small insignificant decisions

# Law

In England and Wales, Section 76 of the Serious Crime Act 2015 created a criminal offence for controlling or coercive behavior in an intimate or family relationship.[18][19] For the purposes of this offence, behaviour must be engaged in "repeatedly" or "continuously". Another, separate, element of the offence is that it must have a "serious effect" on someone and one way of proving this is that it causes someone to fear, on at least two occasions, that violence will be used against them. There is no specific requirement in the Act that the activity should be of the same nature. The prosecution should be able to show that there was intent to control or coerce someone.[20] For relevant behaviour, it has been criminalised in section 77 of the Serious Crime Act 2015.[21] In 2018, Jordan Worth became the first woman to be convicted under this new law.

In the United States, to assist in preventing and stopping domestic violence with children, there have been laws put into place to mandate report in specific professions, such as teacher, doctor, or care provider, any suspected abuse happening in the home. [22]

# Caring professions

According to anti-bullying author and activist Tim Field, bullies are attracted to the caring professions, such as medicine, by the opportunities to exercise power over vulnerable clients, and over vulnerable employees and students.[23]

# Intimate partner abuse

## Background

The power and control "wheel" was developed in 1982 by the Domestic Abuse Program in Minneapolis to explain the nature of abuse, to delineate the forms of abuse used to control another person, and to educate people with the goal of stopping violence and abuse. The model is used in many batterer intervention programs and is known as the Duluth model.[24] Power and control is generally present with violent physical and sexual abuse.[25]

## Control development

Often the abusers are initially attentive, charming, and loving, gaining the trust of the individual that will ultimately become the victim, also known as the survivor. When there is a connection and a degree of trust, the abusers become unusually involved in their partner's feelings, thoughts, and actions.[7] Next, they set petty rules and exhibit "pathological jealousy". A conditioning process begins with alternation of loving followed by abusive behavior. According to *Counselling Survivors of Domestic Abuse*, "These serve to confuse the survivor leading to potent conditioning processes that impact on the survivor's self-structure and cognitive schemas." The abuser projects responsibility for the abuse onto the victim, or survivor, and the denigration and negative projections become incorporated into the survivor's self-image.[7] Control is the defining aspect of an abusive relationship. Catherine Hodes argues that while conflict is often found in these relationships, it is not the defining factor of abuse. Instead, an emphasis of power dynamics in domestic relationships is suggested to be the principle indicator. [26]

Traumatic bonding occurs as the result of ongoing cycles of abuse in which the intermittent reinforcement of reward and punishment creates powerful emotional bonds that are resistant to change.[7]



## Tactics

Controlling abusers use multiple tactics to exert power and control over their partners. According to Jill Cory and Karen McAndless-Davis, authors of *When Love Hurts: A Woman's Guide to Understanding Abuse in Relationships*: Each of the tactics within the power and control wheel are used to "maintain power and control in the relationship. No matter what tactics your partner uses, the effect is to control and intimidate you or to influence you to feel that you do not have an equal voice in the relationship."[3]

### Coercion and threats

A tool for exerting control and power is the use of threats and coercion. The victim may be subject to threats that they will be left, hurt, or reported to welfare. The abuser may threaten that they will commit suicide. They may also coerce them to perform illegal actions or to drop charges that they may have against their abuser.[29] Strangulation, a particularly pernicious abusive behavior in which the abuser literally has the victim's life in his hands, is an extreme form of abusive control. Sorenson and colleagues have called strangulation the domestic violence equivalent of waterboarding, which is widely considered to be a form of torture.[30]

At its most effective, the abuser creates intimidation and fear through unpredictable and inconsistent behavior.[7] Absolute control may be sought by any of four types of sadists: explosive, enforcing, tyrannical, or spineless sadists. The victims are at risk of anxiety, dissociation, depression, shame, low self-esteem, and suicidal ideation.[31]

Tactics of violent and non-violent relationships[27][3]



Power and control in violent relationships[28]

### Intimidation

Abused individuals may be intimidated by the brandishing of weapons, destruction of their property or other things, or use of gestures or looks to create fear.[29] For example, threatening to use a gun or simply displaying the weapon is a form of intimidation and coercive control.[32]

### Economic abuse

An effective means of ensuring control and power over another is to control their access to money. One method is to prevent the victim from getting or retaining a job. Controlling their access to money can also be done by withholding information and access to family income, taking their money, requiring the person to ask for money, giving them an allowance, or filing a power of attorney or conservatorship, particularly in the case of economic abuse of the elderly.[29]

### Emotional abuse

Emotional abuse includes name-calling, playing mind games, putting the victim down, blaming the victim, insulting, stalking, ignoring, discounting their feelings and experiences,[33] online harassment, isolating and controlling,[34] or humiliating the individual, private or personal. The goals are to make the person feel badly about themselves, feel guilt, or think that they are crazy.[29] Eventually the victim loses their sense of self worth, self confidence, the trust of their own thoughts and feelings, and who they are as a person.[33] Various studies done by psychologists, such as Angela Kent and Glenn Waller, as well as Hart and Bassard, have found more connections between emotional abuse in childhood being carried into adulthood in professional and personal lives. [35]

## Isolation

Another element of psychological control is the isolation of the victim from the outside world.[25] Isolation includes controlling a person's social activity: who they see, who they talk to, where they go, and any other method to limit their access to others. It may also include limiting what material is read.[29] It can include insisting on knowing where they are and requiring permission for medical care. The abuser exhibits hypersensitive and reactive jealousy.[25]

## Minimizing, denying, and blaming

The abuser may deny the abuse occurred in order to attempt to place the responsibility for their behavior on the victim. Minimizing concerns or the degree of the abuse is another aspect of this control.[29] They will sometimes tell them that they are too sensitive, it's not that big of a deal, or anything along these lines to minimise the feelings and experiences of the victim.The abuser also tends to blame the victim for the problems in the relationship.

## Using children and pets

Children may be used to exert control by the abuser threatening to take the children or making them feel guilty about the children. It could include harassing them during visitation or using the children to relay messages. Another controlling tactic is abusing pets.[29]

## Using privilege

Using "privilege" means that the abuser defines the roles in the relationship, makes the important decisions, treats the individual like a servant, and acts like the "master of the castle".[29]

# Psychological warfare

## Zersetzung

The practice of repression in Zersetzung comprised extensive and secret methods of control and psychological manipulation, including personal relationships of the target, for which the Stasi relied upon its network of informal collaborators,[36] (in German *inoffizielle Mitarbeiter* or *IM*), the state's power over institutions, and on operational psychology. Using targeted psychological attacks the Stasi tried to deprive a dissident of any chance of a "hostile action".

# Serial killers

The main objective for one type of serial killer is to gain and exert power over their victim. Such killers are sometimes abused as children, leaving them with feelings of powerlessness and inadequacy as adults.[37] Many power or control-motivated killers sexually abuse their victims, but they differ from hedonistic killers in that rape is not motivated by lust (as it would be with a lust murder), but as simply another form of dominating the victim.[38] (See article causes of sexual violence for the differences regarding anger rape, power rape, and sadistic rape.) Ted Bundy is an example of a power/control-oriented serial killer.

# In the workplace

A power and control model has been developed for the workplace, divided into the following categories:[39]

- overt actions
- covert actions
- emotional control
- isolation
- economic control
- tactics
- restriction
- management privilege

## Workplace psychopaths

The authors of the book *Snakes in Suits: When Psychopaths Go to Work* describe a five-phase model of how a typical workplace psychopath climbs to and maintains power:[40]

1. **Entry** – psychopath will use highly developed social skills and charm to obtain employment into an organisation. At this stage it will be difficult to spot anything that is indicative of psychopathic behaviour, and as a new employee one might perceive the psychopath to be helpful and even benevolent.
2. **Assessment** – psychopath will weigh one up according to one's usefulness, and one could be recognised as either a pawn (who has some informal influence and will be easily manipulated) or a patron (who has formal power and will be used by the psychopath for protection against attacks)
3. **Manipulation** – psychopath will create a scenario of "psychopathic fiction" where positive information about themselves and negative disinformation about others will be created, where one's role as a part of a network of pawns or patrons will be used and one will be groomed into accepting the psychopath's agenda.
4. **Confrontation** – the psychopath will use techniques of character assassination to maintain an agenda, and one will be either discarded as a pawn or used as a patron
5. **Ascension** – one's role as a patron in the psychopath's quest for power will be discarded, and the psychopath will usurp a position of power and prestige from anyone who once supported them.

# Personality psychology

In the study of personality psychology, certain personality disorders display characteristics involving the need to gain compliance or control over others:[41]

- Those with antisocial personality disorder tend to display a superficial charm that helps to disarm others, giving a good likable first impression. If someone likes another person, they're much more apt to comply with them. Because they lack empathy, they see other people as instruments and pawns. The effects of this lack of empathy essentially gives them a grandiose sense of self-worth. Due to their callous and unemotional traits, they are well suited to con and/or manipulate others into complying with their wishes.
- Those with borderline personality disorder tend to display black-and-white thinking and are sensitive to others attitudes toward them. Being so averse to rejection may give them motivation to gain compliance in order to control perceptions of others.
- Those with histrionic personality disorder need to be the center of attention; and in turn, draw people in so they may use (and eventually dispose of) their relationship.

- Those with narcissistic personality disorder have an inflated self-importance, hypersensitivity to criticism and a sense of entitlement that compels them to persuade others to comply with their requests. To maintain their self-esteem, and protect their vulnerable true selves, narcissists need to control the behavior of others – particularly that of their children seen as extensions of themselves.[42]

- Those with sadistic personality disorder derive pleasure from the distress caused by their aggressive, demeaning, and cruel behavior toward others. They have poor ability to control their reactions and become enraged by minor disturbances, with some sadists being more severely abusive. They use a wide range of behaviors to inappropriately control others, ranging from hostile glances, threats, humiliation, coercion, and restricting the autonomy of others. Often the purpose of their behavior is to control and intimidate others.[43] The sadistic individuals are likely rigid in their beliefs, intolerant of other races or other "out-groups", authoritarian, and malevolent. They may seek positions in which they are able to exert power over others, such as a judge, army sergeant, or psychiatrist who misuse their positions of power to control or brutalize others. For instance, a psychiatrist may institutionalize a patient by misusing mental health legislation.[43]

# Psychological manipulation

Braiker identified the following ways that manipulators control their victims:[4]

- Positive reinforcement: includes praise, superficial charm, superficial sympathy (crocodile tears), excessive apologizing, money, approval, gifts, attention, facial expressions such as a forced laugh or smile, and public recognition.
- Negative reinforcement: involves removing one from a negative situation as a reward, e.g. "You won't have to do your homework if you allow me to do this to you."
- Intermittent or partial reinforcement: Partial or intermittent negative reinforcement can create an effective climate of fear and doubt. Partial or intermittent positive reinforcement can encourage the victim to persist.
- Punishment: includes nagging, yelling, the silent treatment, intimidation, threats, swearing, emotional blackmail, the guilt trip, sulking, crying, and playing the victim.
- Traumatic one-trial learning: using verbal abuse, explosive anger, or other intimidating behavior to establish dominance or superiority; even one incident of such behavior can condition or train victims to avoid upsetting, confronting, or contradicting the manipulator.

Since the Technological Revolution, online communities have expanded, along with it, online psychological manipulation. Algorithms are being made to detect key phrases, words, images, or "gifs" that contribute to psychological manipulation happening in social media and within online communities.[44]

Manipulators may have:[4]

- a strong need to attain feelings of power and superiority in relationships with others
- a want and need to feel in control
- a desire to gain a feeling of power over others in order to raise their perception of self-esteem.

## Emotional blackmail

Emotional blackmail is a term coined by psychotherapist Susan Forward, about controlling people in relationships and the theory that fear, obligation, and guilt (FOG) are the transactional dynamics at play between the controller and the person being controlled. Understanding these dynamics is useful to anyone

trying to extricate themselves from the controlling behavior of another person, and deal with their own compulsions to do things that are uncomfortable, undesirable, burdensome, or self-sacrificing for others.[45]

Forward and Frazier identify four blackmail types each with their own mental manipulation style:[46]

| Type | Examples |
|---|---|
| **Punisher's threat** | Eat the food I cooked for you or I'll hurt you. |
| **Self-punisher's threat** | Eat the food I cooked for you or I'll hurt myself. |
| **Sufferer's threat** | Eat the food I cooked for you. I was saving it for myself. I wonder what will happen now? |
| **Tantalizer's threat** | Eat the food I cooked for you and you just may get a really yummy dessert. |

There are different levels of demands – demands that are of little consequence, demands that involve important issues or personal integrity, demands that affect major life decisions, and/or demands that are dangerous or illegal.[45]

## Silent treatment

The silent treatment is sometimes used as a control mechanism. When so used, it constitutes a passive-aggressive action characterized by the coupling of nonverbal, but nonetheless unambiguous indications of the presence of negative emotion, with the refusal to discuss the scenario triggering those emotions and, when the source of those emotions is unclear to the other party, occasionally the refusal to clarify it or even to identify that source at all. As a result, the perpetrator of the silent treatment denies the victim both the opportunity to negotiate an after-the-fact settlement of the grievance in question and the ability to modify one's future behavior to avoid giving further offense. In especially severe cases, even if the victim gives in and accedes to the perpetrator's initial demands, the perpetrator may continue the silent treatment so as to deny the victim feedback indicating that those demands have been satisfied. The silent treatment thereby enables its perpetrator to cause hurt, obtain ongoing attention in the form of repeated attempts by the victim to restore dialogue, maintain a position of power through creating uncertainty over how long the verbal silence and associated impossibility of resolution will last, and derive the satisfaction that the perpetrator associates with each of these consequences.[47]

## Love bombing

The expression has been used to describe the tactics used by pimps and gang members to control their victims,[48] as well as to describe the behavior of an abusive narcissist who tries to win the confidence of a victim.[49][50] In 2016, Claire Strutzenberg performed a study researching "love bombing" within the young adult age group 18 to 30 at college. She found in this study that this age group tended to communicate regularly at the start of the relationship, but as the relationship went on, one of the partners tended to passively push more toward being more dominant over the other partner gradually working toward "love bombing."[51]

## Mind games

One sense of mind games is a largely conscious struggle for psychological one-upmanship, often employing passive–aggressive behavior to specifically demoralize or dis-empower the thinking subject, making the aggressor look superior; also referred to as "power games".[52]

In intimate relationships, mind games can be used to undermine one partner's belief in the validity of their own perceptions,[53] often referred to as 'gaslighting'. Personal experience may be denied and driven from memory;[54] and such abusive mind games may extend to denial of the victim's reality, social undermining, and the trivializing of what is felt to be important.[55] Both sexes have equal opportunities for such verbal coercion,[56] which may be carried out unconsciously as a result of the need to maintain one's own self-deception.[57]

## Divide and conquer

A primary strategy the narcissist uses to assert control, particularly within their family, is to create divisions among individuals. This weakens and isolates each of them, making it easier for the narcissist to manipulate and dominate. Some are favoured, others are scapegoated. Such dynamics can play out in a workplace setting.[58]

# Human trafficking

The use of coercion by perpetrators and traffickers involves the use of extreme control. Perpetrators expose the victim to high amounts of psychological stress induced by threats, fear, and physical and emotional violence. Tactics of coercion are reportedly used in three phases of trafficking: recruitment, initiation, and indoctrination.[59] During the initiation phase, traffickers use foot-in-the-door techniques of persuasion to lead their victims into various trafficking industries. This manipulation creates an environment where the victim becomes completely dependent upon the authority of the trafficker.[59] Traffickers take advantage of family dysfunction, homelessness, and history of childhood abuse to psychologically manipulate women and children into the trafficking industry.[60]

The goal of a trafficker is to turn a human being into a slave. To do this, perpetrators employ tactics that can lead to the psychological consequence of learned helplessness for the victims, where they sense that they no longer have any autonomy or control over their lives.[60] Traffickers may hold their victims captive, expose them to large amounts of alcohol or use drugs, keep them in isolation, or withhold food or sleep.[60] During this time the victim often begins to feel the onset of depression, guilt and self-blame, anger and rage, and sleep disturbances, PTSD, numbing, and extreme stress. Under these pressures, the victim can fall into the hopeless mental state of learned helplessness.[59][61][62]

Children are especially vulnerable to these developmental and psychological consequences of trafficking because they are so young. In order to gain complete control of the child, traffickers often destroy physical and mental health of the children through persistent physical and emotional abuse.[63] Stockholm syndrome is also a common problem for girls while they are trafficked, which can hinder them from both trying to escape, and moving forward in psychological recovery programs.[64]

# Oppression

Oppression is the exercise of authority or power in a burdensome, cruel, or unjust manner.[65]

# Bullying

An essential prerequisite of bullying is the perception, by the bully or by others, of an imbalance of social or physical power.[66][67]

# Controlling and coercive behavior

Controlling individuals can be described as perfectionists[68] defending themselves against their own inner vulnerabilities in the belief that if they are not in total control they risk exposing themselves once more to childhood angst.[69] Such persons manipulate and pressure others to change so as to avoid having to change themselves,[70] and use power over others to escape an inner emptiness.[71] When a coercive individual's pattern is broken, the controller is left with a terrible feeling of powerlessness, but feeling their pain and fear brings them back to themselves.[72]

In terms of personality-type theory, controlling persons are very much the Type A personality, driven by the need to dominate and control.[73] An obsessive need to control others is also associated with antisocial personality disorder.[74]

# See also

- Adult-to-adult narcissistic abuse
- Abuse of power
- Blackmail
- Child grooming
- Control of time in power relationships
- Cycle of violence
- Elder abuse
- Enabling
- Expressions of dominance
- Extortion
- Fit in or fuck off
- Mind control
- My way or the highway
- Personal boundaries
- *Power and Control: Domestic Violence in America*
- Protection racket
- Sharp power
- Struggle session
- Victim playing

# References

1. Lehmann, Peter; Simmons, Catherine A.; Pillai, Vijayan K. (2012-08-01). "The Validation of the Checklist of Controlling Behaviors (CCB): Assessing Coercive Control in Abusive Relationships" (https://doi.org/10.1177/1077801212456522). *Violence Against Women*. **18** (8): 913–933. doi:10.1177/1077801212456522 (https://doi.org/10.1177%2F1077801212456522). ISSN 1077-8012 (https://www.worldcat.org/issn/1077-8012). PMID 23008428 (https://pubmed.ncbi.nlm.nih.gov/23008428). S2CID 39673421 (https://api.semanticscholar.org/CorpusID:39673421).

2. *Economic abuse wheel* (http://wdachoices.org.uk/wp-content/uploads/2013/07/WDAH_flipchart_money_wheel.pdf). Women's Domestic Abuse Helpline. Retrieved December 13, 2016.

3. Jill Cory; Karen McAndless-Davis. *When Love Hurts: A Woman's Guide to Understanding Abuse in Relationships (https://books.google.com/books?id=qBFdlUnxmkkC&pg=PA30)*. WomanKind Press; 2000. ISBN 978-0-9686016-0-0. p. 30.

4. Braiker, Harriet B. (2004). *Who's Pulling Your Strings ? How to Break The Cycle of Manipulation*. ISBN 0-07-144672-9.

5. Simon, George K (1996). *In Sheep's Clothing: Understanding and Dealing with Manipulative People*. ISBN 978-1-935166-30-6.

6. Kantor, Martin (2006) *The Psychopathology of Everyday Life: How to Deal with Manipulative People*. ISBN 978-0-275-98798-5.

7. Chrissie Sanderson. *Counselling Survivors of Domestic Abuse (https://books.google.com/books?id=5vA42Opyx9cC&pg=PA84)*. Jessica Kingsley Publishers; 2008. ISBN 978-1-84642-811-1

8. Crosson-Tower, Cynthia (2005). *Understanding Child Abuse and Neglect*. Allyn & Bacon. p. 208. ISBN 0-205-40183-X.

9. Monique Mattei Ferraro; Eoghan Casey; Michael McGrath; Michael McGrath (2005). *Investigating Child Exploitation and Pornography: The Internet, the Law and Forensic Science* (https://books.google.com/books?id=BtjzJhcAAGYC&pg=PA159). Academic Press. p. 159. ISBN 0121631052. Retrieved April 6, 2016.

10. Christiane Sanderson (2006). *Counselling Adult Survivors of Child Sexual Abuse* (https://book s.google.com/books?id=Hpq-SvwKtkUC&pg=PA30). Jessica Kingsley Publishers. ISBN 1843103354. Retrieved April 6, 2016.

11. "Sleep Deprivation Used as Abuse Tactic" (https://www.domesticshelters.org/articles/identifying -abuse/sleep-deprivation-as-abuse). *DomesticShelters.org*.

12. "Family and Domestic Violence – Healthy Work Healthy Living Tip Sheet" (https://federation.ed u.au/staff/working-at-feduni/feduni-against-violence/family-and-domestic-violence?a=282376).

13. Miller, Paul M.; LISAK, DAVID (1999-06-01). "Associations Between Childhood Abuse and Personality Disorder Symptoms in College Males" (https://doi.org/10.1177/0886260990140060 05). *Journal of Interpersonal Violence*. **14** (6): 642–656. doi:10.1177/088626099014006005 (htt ps://doi.org/10.1177%2F088626099014006005). ISSN 0886-2605 (https://www.worldcat.org/is sn/0886-2605). S2CID 144858964 (https://api.semanticscholar.org/CorpusID:144858964).

14. Baumann, J.D., Mark. "Coercive control and emotional abuse illegal in U.K., France, Ireland – and Clallam?" (https://clallamcountybar.com/coercive-control-and-emotional-abuse-illegal-in-u-k-france-ireland-clallam-county/). *Clallam County Bar Clallam County lawyers & legal news*. Retrieved 27 October 2020.

15. Price, Hannah. "Coercive control: 'I was 16 and thought it was normal' " (https://www.bbc.co.uk/ bbcthree/article/f2b92a97-66d8-42b5-8d70-6a38c29b82e1). *BBC*. Retrieved 27 October 2020.

16. "Institutional Abuse Definition & Signs" (https://www.anncrafttrust.org/institutional-abuse-definiti ons-signs-symptoms/). *Ann Craft Trust.* 2019-05-08. Retrieved 2021-03-09.

17. Powers, J. L.; A. Mooney; M. Nunno (1990). "Institutional abuse: A review of the literature". *Journal of Child and Youth Care*. **4** (6): 81.

18. Statutory guidance framework: controlling or coercive behaviour in an intimate or family relationship (https://www.gov.uk/government/publications/statutory-guidance-framework-control ling-or-coercive-behaviour-in-an-intimate-or-family-relationship) 05 Dec 2015 *gov.uk*

19. "University graduate from Poole admits controlling and coercive behaviour" (https://www.bourn emouthecho.co.uk/news/17530455.university-graduate-from-poole-admits-controlling-and-coer cive-behaviour/) *Daily Echo* 27 Mar 2019

20. "Controlling or Coercive Behaviour in an Intimate or Family Relationship" (https://www.cps.gov. uk/legal-guidance/controlling-or-coercive-behaviour-intimate-or-family-relationship). *CPS.gov.uk*. OGL Text was copied from this source, which is available under an Open Government Licence v2.0 (http://www.nationalarchives.gov.uk/doc/open-government-licence/ve rsion/2/). © Crown copyright.

21. "Serious Crime Act 2015" (https://www.legislation.gov.uk/ukpga/2015/9/section/77). *legislation.gov.uk*.

22. Hyman, Ariella; Schillinger, Dean; Lo, Bernard (1995-06-14). "Laws Mandating Reporting of Domestic Violence: Do They Promote Patient Well-being?" (https://jamanetwork.com/journals/j ama/fullarticle/388829). *JAMA*. **273** (22): 1781–1787. doi:10.1001/jama.1995.03520460063037 (https://doi.org/10.1001%2Fjama.1995.03520460063037). ISSN 0098-7484 (https://www.world cat.org/issn/0098-7484). PMID 7769774 (https://pubmed.ncbi.nlm.nih.gov/7769774).

23. Field, T. (2002). "Bullying in medicine" (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC112271 5). *BMJ*. **324** (7340): 786a–786. doi:10.1136/bmj.324.7340.786/a (https://doi.org/10.1136%2Fb mj.324.7340.786%2Fa). PMC 1122715 (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC112271 5). PMID 11923166 (https://pubmed.ncbi.nlm.nih.gov/11923166).

24. Joan McClennen. *Social Work and Family Violence: Theories, Assessment, and Intervention (h ttps://books.google.com/books?id=nHHWSsUvXwwC&pg=PA147)*. Springer Publishing Company; 2010. ISBN 978-0-8261-1133-3. p. 147.

25. *Global and regional estimates of violence against women: prevalence and health effects of intimate partner violence and non-partner sexual violence.* (http://apps.who.int/iris/bitstream/10 665/85239/1/9789241564625_eng.pdf) World Health Organization. 2013. ISBN 978-92-4-156462-5. p. 7.

26. Hodes, Catherine; Mennicke, Annelise (2019-06-01). "Is It Conflict or Abuse? A Practice Note for Furthering Differential Assessment and Response" (https://doi.org/10.1007/s10615-018-065 5-8) *Clinical Social Work Journal*. **47** (2): 176–184. doi:10.1007/s10615-018-0655-8 (https://do i.org/10.1007%2Fs10615-018-0655-8). ISSN 1573-3343 (https://www.worldcat.org/issn/1573-3 343). S2CID 150357825 (https://api.semanticscholar.org/CorpusID:150357825).

27. Dr. Joan McClennen PhD. *Social Work and Family Violence: Theories, Assessment, and Intervention (https://books.google.com/books?id=nHHWSsUvXwwC&pg=PA148)*. Springer Publishing Company; 2010. ISBN 978-0-8261-1133-3. p. 148.

28. Dr. Joan McClennen PhD. *Social Work and Family Violence: Theories, Assessment, and Intervention (https://books.google.com/books?id=nHHWSsUvXwwC&pg=PA149)*. Springer Publishing Company; 2010. ISBN 978-0-8261-1133-3. p. 149.

29. *Power and Control.* (http://www.theduluthmodel.org/pdf/PowerandControl.pdf) Duluth Model. Retrieved April 19, 2014.

30. Thomas, KA; Joshi, M; Sorenson, SB (2014). " 'Do you know what it feels like to drown?': Strangulation as coercive control in intimate relationships". *Psychology of Women Quarterly*. **38**: 124–137. doi:10.1177/0361684313488354 (https://doi.org/10.1177%2F036168431348835 4). S2CID 144979650 (https://api.semanticscholar.org/CorpusID:144979650).

31. Chrissie Sanderson. *Counselling Survivors of Domestic Abuse (https://books.google.com/book s?id=5vA42Opyx9cC&pg=PA25)*. Jessica Kingsley Publishers; 2008. ISBN 978-1-84642-811-1. p. 25.

32. Sorenson SB, Schut RA. "Nonfatal gun use in intimate partner violence: a systematic review of the literature". *Trauma Violence & Abuse*. 2016 Sep 14. [Epub ahead of print]

33. "Emotional Abuse" (https://utdallas.edu/counseling/emotionalabuse/). *utdallas.edu*. Retrieved 2021-03-10.

34. "Kupferman & Golden Family Law – Emotional Abuse and Intimidation in Domestic Violence" (https://www.kgfamilylaw.com/emotional-abuse-and-intimidation-in-domestic-violence/). Retrieved 2021-03-10.

35. Kent, Angela (May 1998). "The Impact of Childhood Emotional Abuse: An Extension of the Child Abuse and Trauma Scale" (https://www.sciencedirect.com/science/article/pii/S01452134 98000076?casa_token=267CvG6RRL0AAAAA:5ZfkrCj6_wGEbytbGl3UVKLU4aG_mREQEM mMpYRElvFf54mlD8eecJnj5nEmXkidhiQHZKOi78zH). *Child Abuse and Neglect*. **22** (5): 393–399. doi:10.1016/S0145-2134(98)00007-6 (https://doi.org/10.1016%2FS0145-2134%2898%29 00007-6). PMID 9631251 (https://pubmed.ncbi.nlm.nih.gov/9631251) – via Science Direct.

36. Federal Commissioner for the Records of the State Security Service of the former German Democratic Republic: The Unofficial Collaborators (IM) of the MfS (http://www.bstu.bund.de/EN/ MinistryOfStateSecurity/UnofficialCollaboratorsOfMfS/_node.html)

37. Davies, Nicola (June 26, 2018). "From Abused Child to Serial Killer: Investigating Nature vs Nurture" (http://files.claudiomarcassoli.it/200000151-3035c3130d/FROM%20ABUSED%20CHI LD%20to%20SERIAL%20KILLER.pdf) (PDF). *Psychiatry Advisor*.

38. Egger, Steven A. (2000). "Why Serial Murderers Kill: An Overview". *Contemporary Issues Companion: Serial Killers*.

39. Power & Control in the Workplace (http://www.ncdsv.org/images/Duthie_workplace-power-cont rol-wheel_2013.pdf) American Institute on Domestic Violence

40. Baibak, P; Hare, R. D *Snakes in Suits: When Psychopaths Go to Work* (2007)

41. Larsen, Randy J., and David M. Buss. *Personality Psychology: Domains of Knowledge about Human Nature*. New York: McGraw-Hill Higher Education, 2010. ISBN 978-0073370682

42. Rappoport, Alan, Ph. D."Co-Narcissism: How We Adapt to Narcissism". *The Therapist*, 2005 (http://www.alanrappoport.com/pdf/Co-Narcissism%20Article.pdf).

43. Adrian Raine; José Sanmartin.

44. Peleschyshyn, A.; Holub, Z.; Holub, I. (September 2018). "The Preliminary Stage of the Algorithm for Detecting Information and Psychological Manipulation in Online Communities" (https://ieeexplore.ieee.org/document/8526632). *2018 IEEE 13th International Scientific and Technical Conference on Computer Sciences and Information Technologies (CSIT)*. **2**: 30–33. doi:10.1109/STC-CSIT.2018.8526632 (https://doi.org/10.1109%2FSTC-CSIT.2018.8526632). ISBN 978-1-5386-6464-3. S2CID 53280120 (https://api.semanticscholar.org/CorpusID:53280120).

45. Johnson, R. Skip (16 August 2014). "Emotional Blackmail: Fear, Obligation and Guilt (FOG)" (http://bpdfamily.com/content/emotional-blackmail-fear-obligation-and-guilt-fog). *BPDFamily.com*. Retrieved 18 October 2014.

46. Susan Forward/Donna Frazier, *Emotional Blackmail* (London 1997) pp. 28, 82, 145, 169 ISBN 978-0593042397

47. Petra Boynton The Telegraph (26 Apr 2013) Silent treatment: how to snap him out of it (https://www.telegraph.co.uk/women/sex/10020662/Silent-treatment-how-to-snap-him-out-of-it.html)

48. *Gangs and Girls: Understanding Juvenile Prostitution*, Michel Dorais, Patrice Corriveau, McGill-Queen's Press – MQUP, 2009, p. 38

49. Red Flag of a Narcissist #1: Love Bombing (http://narcissistsupport.com/red-flag-2-love-bombing/) Archived (https://web.archive.org/web/20150823040834/http://narcissistsupport.com/red-flag-2-love-bombing/) 2015-08-23 at the Wayback Machine; My Narcissistic Ex-Husband (https://www.firstwivesworld.com/index.php/my-narcissistic-ex-husband/item/8959-what-is-love-bombing?)

50. "Helen Bailey murder trial: Ian Stewart 'grossly deceived' author" (https://www.bbc.co.uk/news/uk-england-beds-bucks-herts-38989935). *BBC News Online*. BBC. 16 February 2017. Retrieved 22 February 2017.

51. Strutzenberg, Claire (December 2016). "Love-Bombing: A Narcissistic Approach to Relationship Formation" (https://scholarworks.uark.edu/cgi/viewcontent.cgi?referer=https://scholar.google.com/&httpsredir=1&article=1000&context=hdfsrsuht). *Human Development, Family Sciences and Rural Sociology*.

52. Gita Mammen, *After Abuse* (2006) p. 29

53. Kathleen J, Ferraro, *Neither Angels nor Demons* (2006) p. 82

54. R. D. Laing, *The Politics of Experience* (Penguin 1984) p. 31

55. Laurie Maguire, *Where there's a Will there's a Way* (London 2007) p. 76

56. Kate Fillion, *Lip Service* (London 1997) p. 244

57. R. D. Laing, *Self and Others* (Penguin 1969) p. 143

58. Hall J It's You and Me Baby: Narcissist Head Games (http://narcissistfamilyfiles.com/2017/03/27/its-you-and-me-baby-narcissist-head-games/) The Narcissist Family Files 27 Mar 2017

59. Hopper, E. and Hidalgo, J. (2006). "Invisible chains: Psychological coercion of human trafficking victims". *Intercultural Human Rights Law*, 1, 185–209.

60. Wilson, B.; Butler, L. D. (2013). "Running a gauntlet: A review of victimization and violence in the pre-entry, post-entry, and peri-/post-exit periods of commercial sexual exploitation". *Psychological Trauma: Theory, Research, Practice, and Policy*. **6** (5): 494–504. doi:10.1037/a0032977 (https://doi.org/10.1037%2Fa0032977).

61. Segerstrom, S. C.; Miller, G. E. (2004). "Psychological stress and the human immune system: A meta-analytic study of 30 years of inquiry" (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1361 287). *Psychological Bulletin*. **130** (4): 601–630. doi:10.1037/0033-2909.130.4.601 (https://doi.or g/10.1037%2F0033-2909.130.4.601). PMC 1361287 (https://www.ncbi.nlm.nih.gov/pmc/article s/PMC1361287). PMID 15250815 (https://pubmed.ncbi.nlm.nih.gov/15250815).

62. Zimmerman, C., Hossain, M., Yun, K., Roche, B., Morison, L., and Watts, C. (2006). Stolen Smiles: A summary report on the physical and psychological health consequences of women and adolescents trafficked in Europe. *The London School of Hygiene and Tropical Medicine: Daphne*, 1–28.

63. Rafferty, Y (2008). "The impact of trafficking on children: Psychological and social policy perspectives". *Child Development Perspectives*. **2**: 13–18. doi:10.1111/j.1750-8606.2008.00035.x (https://doi.org/10.1111%2Fj.1750-8606.2008.00035.x).

64. Rafferty, Y (2013). "Child trafficking and commercial sexual exploitation: A review of promising prevention policies and programs". *American Journal of Orthopsychiatry*. **83** (4): 559–575. doi:10.1111/ajop.12056 (https://doi.org/10.1111%2Fajop.12056). PMID 24164528 (https://pubm ed.ncbi.nlm.nih.gov/24164528).

65. definition from Merriam Webster Online (https://archive.is/20120729230603/http://www.aolsvc. merriam-webster.aol.com/dictionary/oppression).

66. "Children who are bullying or being bullied" (https://web.archive.org/web/20131029215401/htt p://www.cambridgeshire.gov.uk/childrenandfamilies/parenting/childsbehaviour/bullying.htm). *Cambridgeshire County Council: Children and families*. Cambridgeshire County Council. 2013-07-24. Archived from the original (http://www.cambridgeshire.gov.uk/childrenandfamilies/ parenting/childsbehaviour/bullying.htm) on 2013-10-29. Retrieved 2013-10-28.

67. Ericson, Nels (June 2001). "Addressing the Problem of Juvenile Bullying" (https://www.ncjrs.go v/pdffiles1/ojjdp/fs200127.pdf) (PDF). *OJJDP Fact Sheet #FS-200127*. U.S. Department of Justice: Office of Juvenile Justice and Delinquency Prevention. **27**. Retrieved 2013-10-28.

68. Michelle N. Lafrance, *Women and Depression* (2009) p. 89

69. Art Horn, *Face It* (2004) p. 53

70. Robin Skynner/John Cleese, *Families and how to survive them* (London 1994) p. 208

71. Robert Bly and Marion Woodman, *The Maiden King* (Dorset 1999) p. 141

72. Patricia Evans, *Controlling People* (Avon 2002) pp. 129, 274

73. Andrew Holmes/Dan Wilson, *Pains in the Office* (2004) p. 56

74. Martha Stout, *The Sociopath Next Door* (2005) p. 47

# External links

- Sarah Strudwick (Nov 16, 2010) Dark Souls – Mind Games, Manipulation and Gaslighting (http s://www.youtube.com/watch?v=PwWBHRKFYCA)

Retrieved from "https://en.wikipedia.org/w/index.php?title=Abusive_power_and_control&oldid=1018048392"

This page was last edited on 16 April 2021, at 01:03 (UTC).

Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

# Abuse of Epidemiology:

## Automobile Manufacturers Manufacture a Defense to Asbestos Liability

### DAVID S. EGILMAN, MD, MPH, MARION A. BILLINGS, MSC

Much of the "debate" about the relationship between asbestos exposure from automobile brake work and asbestos-induced cancer has been fueled by studies that have been funded by corporations with billions at stake in tort litigation. The authors explore how asbestos-lined brake manufacturers have corrupted medical literature to escape liability, analyzing studies funded by these companies to enable them to claim that work with asbestos brake linings never causes mesothelioma. They reveal how the companies have redefined scientific criteria for the determination of cause–effect relationships and manipulated scientific data to give the impression of an absence of effect. But the absence of evidence is not evidence of the absence of an effect. *Key words*: mesothelioma; asbestos; corruption; occupational health; brake mechanics.

INT J OCCUP ENVIRON HEALTH 2005;11:360–371

In recent years, thousands of automobile and "shade-tree" (amateur) mechanics have sought compensation for asbestos-related disease from manufacturers of asbestos-lined brakes. Despite the fact that these brakes are 40–70% asbestos, the brake manufacturers have vigorously denied that they contributed in any way to a single case of asbestos-caused disease.[1] The brake manufacturers have dismissed the fact that there is no known threshold of exposure associated with mesothelioma (a rare cancer of the pleura or peritoneum), and that in some cases the only documented worker exposures are those that have occurred as a result of exposures to asbestos from brakes.[2] Rather than accept the well-established scientific facts, the industry has funded scientists and lawyers to develop arguments and methods for defending against lawsuits brought by workers and their household members who have developed mesothelioma as a result of exposure to asbestos in brakes.[1,3–6] To support their arguments, the automobile manufacturers have hired consultants to reanalyze previously published hygiene and epidemiologic studies.[4–7]

Some manufacturers of asbestos-lined brakes—including GM, Ford, Daimler–Chrysler, and Bendix—have sponsored four notable examples of such research since the late 1990s. In 2001, Otto Wong, an epidemiologist working for a California-based health sciences company, fired the first salvo of their defense.[6] Although Wong's paper is couched as a critique of regulation of exposures to asbestos-lined brakes and EPA risk assessments, Bendix (an automobile brake manufacturer) first presented it as an expert report to defend against a lawsuit by a worker who had been exposed to asbestos brake linings and had contracted mesothelioma.[8] Three years later other manufacturers of asbestos-lined brakes (GM, Ford, and Chrysler) sponsored Goodman et al. to write a second brake-related lung cancer meta-analysis combined with a duplication of Wong's mesothelioma analysis.[5] The automobile companies then sponsored Hessel et al. to write a third paper which was an extension of a paper by Spirtas of the NIH that had already been included in Goodman et al. and Wong's meta-analysis.[4] Finally, the industry subsidized an incomplete analysis of historical exposures to asbestos in brake work.[3]

These companies have spent millions of dollars to generate these epidemiologic studies in order to refute claims of causation and thereby avoid compensation payments to victims and their families. Accordingly, all four papers demonstrate the use of two practices associated with the industry's involvement in scientific research: the redefinition of scientific criteria for the determination of cause–effect relationships and the manipulation of scientific data. In this paper we critique these methods, drawing examples from the first three of the four papers cited above. The first section delineates the process of redefinition of scientific criteria for determination of causation, followed by a more in-depth discussion of specific methods of scientific manipulation utilized in the studies by Goodman et al., Wong, and Hessel. As a whole, we analyze the value of this type of research in regard to its claims about the relationship between exposures to asbestos during brake work and induction of mesothelioma.

Received from the Department of Community Health, Brown University, Providence, Rhode Island.

Address correspondence and reprint requests to David Egilman, MD, 8 North Main Street, Suite 404, Attleboro, MA 02703, U.S.A.; telephone: (508) 226-5091; e-mail: <degilman@egilman.com>.

# REDEFINITION OF SCIENTIFIC CRITERIA FOR DETERMINATION OF CAUSE–EFFECT RELATIONSHIPS

This method, first developed by the tobacco industry, involves two parts.[9] First, industry lawyers and scientists redefine the type and amount of "proof" required to legally establish causation.[9] This is done by derogating unfavorable classes of evidence that are unfavorable to industries' litigation and regulatory positions and insisting that evidence that does not exist or is favorable to industry is most important or essential to establish a cause–effect relationship in court. For example, when a suspect carcinogen is found to cause cancer in human epidemiology studies but not in animals, companies argue that animal studies are required to prove causation.[9] On the other hand when animal studies are positive and human epidemiology is incomplete or negative, companies argue that human evidence is required before the government can regulate the substance and before workers and others can be compensated.[9]

For example, tobacco companies argue that human epidemiologic studies cannot establish causation but instead only establish some "non-definitive" association between exposure to tobacco smoke and cancer.[10] They have argued that epidemiologic studies cannot distinguish a genetic link between the propensity to smoke and the propensity to contract cancer.[10] This critique of human epidemiologic studies is true, but irrelevant since there is no biologic basis for such speculation. On the other hand, when early researchers failed to induce cancer in animals that were exposed to tobacco smoke, tobacco companies insisted that only animal inhalation studies could "prove" causation.[10] After the now-famous beagle studies, these companies emphasized the importance of mechanistic understanding as a causal requirement.[10] They then argued that unless one could explain exactly how tobacco smoke caused cancer they had no "scientific proof" of causation.[10] Some chemical manufacturers have made comparable epistemological arguments when studies of their products have followed a similar fact pattern. In the early 1970s, for example, when researchers failed to induce cancer in animals following benzene exposure, industry expert witnesses stated that these missing animal data were required to establish that a substance was a human carcinogen.[11,12]

The second element of this method is industry's insistence on direct causal evidence related to specific forms of exposure in individual cohorts of workers. Human epidemiology is often lacking for most chemical-exposure cancer effects. Most chemical companies, therefore, argue that these missing "animal or other studies," or human studies in which the exposed workers are exposed to the substance in question only (a virtual impossibility), are required to establish proof of a cause–effect relationship. In the latter case, industry argues that animal and in vitro studies are rendered invalid as evidence of causation.[9] Since cancer effects have long latent periods and workers are generally subject to potential confounding exposures, these studies are rare and easily criticized.[9] When clear epidemiologic evidence of causation exists, as is the case of the relationship between asbestos and mesothelioma, companies and their experts have argued that before an injured worker can even file a claim for compensation two epidemiologic studies in similarly exposed individuals that find a statistically significant doubling of the risk must be published in peer-reviewed journals.[13] Some Texas courts have accepted this argument and even appear to require the publication of human epidemiologic studies for subgroups of particular industries with statistically significant rate ratios above two before a worker can even file a lawsuit.[14] Greenland calls the use of this criteria a "methodologic error that has become a social problem."[15]

These stringent legal requirements can be contrasted with the normal physician practice of assigning causation based on an analysis of all available evidence with no specific rate ratio or statistical requirements.[16] In general, practicing physicians attribute lung cancer causation to tobacco smoking if there is evidence of a history of smoking any cigarettes, regardless of brand, for often unspecified time frames prior to disease diagnosis.[9] Practicing physicians would not check to see whether a published, peer-reviewed paper showed that smoking ten cigarettes per day caused a statistically significant doubling of the risk of contracting lung cancer prior to making the determination that a patient's smoking had caused or contributed to his or her cancer. Physicians also take for granted that all brands smoked contributed to disease causation even in the absence of studies evaluating individual brands.

The asbestos-product manufacturers and their experts have constructed an epistemological straw man, asserting that epidemiologic evidence of causation is required in each and every worker cohort that has a documented excess exposure to a harmful substance before evidence of causation can be presented in court. Companies argue that, to prove causation, both the type of asbestos and the nature of exposure (same job, not just comparable exposure) must be clearly documented in an epidemiologic study as having a causal effect on the development of cancer.[13] Even the tobacco companies have not gone so far as to argue that an expert cannot assert that Virginia Slims cause a specific lung cancer subtype (e.g., bronchogenic cancer) in women absent an epidemiologic study of smokers of that particular cigarette showing a statistically significant twofold increased risk in that particular cohort of female smokers for that particular subtype of lung cancer. Yet the asbestos companies and their experts argue that separate cohort studies are needed to establish causation for the same disease for each fiber type and each product composed of that fiber despite the

fact that almost all workers are exposed to more than one fiber type from more that one product.[13]

As a result, companies and their experts attempt to show that exposures to asbestos from their product are somehow "different" or even irrelevant. Manufacturers argue that exposures to asbestos from their products are quantitatively or qualitatively unlike other asbestos exposures.[13] For example, asbestos in their products is "bound" or "degraded" or "decomposed" or "results in too low an exposure" to cause mesothelioma.[13] Unfortunately, some courts have adopted aspects of this reasoning.[17] In the case of chrysotile asbestos—the only fiber type that industry still claims does not cause mesothelioma—the argument that the particular type of asbestos in a company's product is different from other types is now generally recognized as the "amphibole hypothesis."[18–23] It is important to note that product manufacturers who used amosite fiber made similar arguments by claiming that there was insufficient epidemiologic evidence to establish that amosite caused mesothelioma.[24]

## MANIPULATION OF SCIENTIFIC DATA—META-ANALYSIS AND EXPOSURE DATA MISREPRESENTATION

Manipulation of scientific data and misuse or re-interpretation of standard scientific reasoning is ubiquitous in the automobile industry–sponsored asbestos studies. The most common are: selection of inappropriate studies for re-analysis, selective presentation of study data, non-differential exposure-determination bias, inadequate sample size, comparison of an exposed cohort with an inappropriate control group, and misuse of confidence intervals. Here we present these strategies, illustrated with specific examples from the Bendix, Ford, General Motors, and Daimler–Chrysler studies.

### Selective Presentation of Exposure Data

In his article, Wong outlines the "lack of exposure" argument as described in the previous section.[6] In doing so, however, he fails to report studies indicating that work with asbestos brake linings leads to exposures that have resulted in asbestos cancers in other occupational and non-occupational settings.[25] Wong not only ignores exposure studies whose results contradict his industry position; he also misrepresents the results of the studies he does report. He states that "studies have shown that brake lining dust contains little recognizable chrysotile fibers" and extrapolates from a few studies to claim that current exposures are "extremely low."[6] It is true that only some studies have examined decomposed (used) brakes; the heaviest exposure to asbestos occurs during the sanding and grinding of new brakes.[25] Of course, current exposures do not reflect past exposures or risk. Studies of workers' previous job activities reveal

exposure levels hundreds of times higher than current permissible limits.[25] Wong cites some "data" from a 1987 Finnish study by Kauppinen and Korhonen by listing average fiber concentrations as <0.05 fibers/cc.[26] This study also found, however, that the grinding of brake linings produced asbestos concentrations as high as 125 fibers/cm$^3$. Kauppinen and Korhonen reported exposures up to 8.2 f/cm$^3$ during the cleaning of passenger-car drum brakes using a compressed air jet to remove brake dust.[26] (Unfortunately this is still a common practice in many nations, including the United States.) Average concentrations were between 0.1 and 0.2 f/cm$^3$ for truck and bus repair. The only data point Wong chose to report from this study represented average exposures during passenger-car repair. Contrary to Wong's misleading data selection and analysis, this study demonstrated that average asbestos concentrations in Finland may comply with TWA limits, but also showed that peak exposures often exceeded the OSHA excursion limit.[26]

Wong also selectively excerpts information from a paper by Agudo et al., whom he quotes stating, "Overall, 37% of cases of mesothelioma in our population are attributed to a sure (or almost sure) occupational exposure to asbestos and this proportion comes up to 62% when occupations with any probability of exposure are included." In turn, Wong concludes that "this observation underscores the high proportion of malignant mesothelioma cases not related to occupational exposure."[6] Wong makes this assertion but omits Agudo et al.'s subsequent qualifying sentence, which states, "Around 40% of cases of mesothelioma in our population could be due to causes other than occupational exposure to asbestos, although possibility of other occupational exposures in non-traditionally hazardous scenarios cannot be ruled out."

### Manipulation of Meta-analysis: Inappropriate Study Selection and Selective Presentation of Data

Industry researchers can often influence results by careful selection of the epidemiologic studies they decide to evaluate. Studies favored by the industry perspective (those with negative results in regard to the relationship between exposure and cancers) are included, and others are ignored or derogated and then excluded. Goodman et al. and Wong reanalyzed a series of epidemiologic studies, claiming that they failed to find an association between brake work and an increased incidence of mesothelioma.[5,6] Both, however, disregard numerous methodologic problems in the individual studies they chose to incorporate in their analyses and ignore study limitations noted by the original authors. Furthermore, these authors selectively omit key information that undermines their conclusions and evidence.

Goodman et al. first attempt to evaluate the quality of 11 studies with potentially relevant information

about the relationship between brake work and mesothelioma. The authors use a self-created 11-point scale to evaluate the studies (the rating system allowed for negative scores). The highest ranked study—one of two purported "studies" based on "personal communications" by Goodman and Hessel themselves—garners a 5, out of 9. The scores for the rest of the studies included in the meta-analysis are unimpressive: 3, 4, 1, 4, 1, and 2, out of 9. Goodman et al. excluded studies that scored minus 1 (the rating system allowed for negative scores) but none of the included studies achieved a passing grade of 60% based on normal academic standards. Goodman et al. seem to believe that evaluating the studies in such a way somehow mitigates their underlying methodologic errors and inadequacies. Unfortunately, revealing errors is not the same as fixing them, and these studies, which were never designed to assess mesothelioma risk to brake-exposed workers, are beyond repair.

After this elaborate quality evaluation, Goodman et al. performed a meta-analysis using the same studies that Wong had reviewed three years before. They excluded two cohorts. The first of these was a study of 685 automobile mechanics that reported two mesotheliomas.[27] The second found a statistically significant excess of mesothelioma in mechanics with a reported rate ratio.[28]

Furthermore, Goodman and his colleagues present the data entirely out of context. The original authors of the underlying studies did not design them to examine the specific issue of exposure to asbestos during brake work and subsequent incidence of mesothelioma. The extraction, therefore, of occasional study participants who happen to be automobile mechanics not only lacks statistical power but cannot be independently used as concrete evidence proving the absence of a relationship between a complicated exposure and a potential outcome. Due to the inherent difficulty in determining asbestos exposure (especially in the case of brake work due to the large number of amateur brake jobs and part-time brake work that can easily go unnoticed when determining exposure) cohort studies must be specifically designed to address the issue of mesothelioma among those exposed to brake dust. Until such studies are conducted, it is wrong to conclude that epidemiologic studies fail to establish a relationship between brake work and asbestos-induced cancer. The converse, however, is not true. To paraphrase Karl Popper, finding a thousand white swans does not prove that all swans are white; the discovery of a single black swan disproves that hypothesis.[29] This is particularly true when a researcher is relying on studies of all bird species (all SIC codes) to determine the color of swans (risk in brake workers). As Lemen has shown, there are plenty of black swans in the context of asbestos-induced cancer; he has documented more than 220 published cases of mesothelioma in users of friction products.[25]

The automobile manufacturers have spent millions of dollars to reanalyze studies that were never designed to determine mesothelioma risk in brake mechanics. On the other hand, they have access to a cohort of their own and their dealers' workers, whose work involves the installation and repair of brakes. They are perfectly situated to use other demographically similar employees who work at these same facilities as a control population. In many cases they have access to medical and workers' compensation records that would allow them to efficiently conduct such a study. Why haven't they done so?*

Wong and Goodman et al. both exclude evidence from other epidemiologic studies that contradict their conclusions. Hansen, for example, examined the mortality of automobile mechanics and found an excess mortality from mesothelioma.[32] The study reported a single case of mesothelioma over a ten-year period among approximately 20,000 automobile mechanics, yet, because of the rarity of the disease, the authors concluded that, "asbestos exposure is known to occur during the replacement of brake linings, and the single case of pleural mesothelioma is an indication that this exposure has not been negligible."

### Differential Exposure-determination Bias

In his meta-analysis Wong relied primarily on case–control studies that were fraught with problems of differential exposure-determination bias. Asbestos exposure is difficult to determine since many individuals are unaware of their exposures, especially in secondary cases in which an individual might inhale asbestos fibers from the clothing of a spouse or parent returning home from asbestos-related work. In the case of brake work, many individuals engage in part-time or amateur mechanic work, yet otherwise engage in other careers and may therefore be classified as unexposed if determination is based on a classical epidemiologic determination of "regular occupation." Of course the direction of any potential or actual bias is a key issue in analyzing its potential effect on the results of a study. Random exposure misclassification biases results towards the null. However, as we discuss below, in this case, because exposure is more often missed in the exposed cohort, the misclassification is likely to lead to an inverse relationship between exposure and disease.

In the case of mesothelioma, in which the time between diagnosis and death is usually a matter of months, retrospective study designs such as case–con-

---

*Or perhaps their lawyers have already conducted such a study and kept it secret. As has been noted, in tobacco litigation, company lawyers often contract with experts to conduct studies. If the studies are unfavorable the company does not have to produce these in litigation. The brake manufacturers' lawyers have funded and actually helped conduct some studies related to brake exposures.[30,31]

trol studies often require the interviewing of surrogates (spouse, children, etc) to determine exposure. Direct interviews of cases or controls are far more likely to uncover prior brake exposure than are interviews with surrogates. Individuals who did not work primarily as automobile mechanics are likely to be misclassified as unexposed if surrogate interviewees are unaware of any part-time or amateur brake work done earlier in life. Since mesothelioma cases are more likely to be deceased at the time of interview than controls, a differential exposure-determination bias may show that the "exposed" have less risk than the unexposed. Next-of-kin interviews are particularly subject to this result, since brake exposures often occur among "shade tree," occasional, or even high school mechanics in automobile repair courses. These exposures are more likely to be reported by patients themselves than by relatives, particularly children of patients. In many of the studies the researchers determined exposure from direct interview of controls, in comparison with greater reliance on interviews with survivors of mesothelioma patients. Next-of-kin interviews were therefore used more often to estimate exposure in mesothelioma patients than in controls. Since direct interviews are more likely to elicit a history of exposure to brakes than next-of-kin interviews, brake exposures are systematically more likely to be recorded for controls than cases. Goodman et al. acknowledge the problem of next-of-kin interview bias but omit any discussion of the fact that the consequence of this bias is a result showing that brake work protects against mesothelioma. This phenomenon is demonstrated by the fact that most of the studies Wong and Goodman et al. selected had rate ratios of less than one. Wong's overall point estimate was 0.90 (95% confidence interval 0.66–1.23), while Goodman et al. determined that exposure to brake dust produced a statistically significant and important reduction in the rate of mesothelioma of 0.67 (95% confidence interval 0.53–0.84) in all studies combined.† The finding that brake work reduces the risk of mesothelioma is a sign of systematic error in this meta-analysis, because exposure to asbestos brakes cannot reduce the risk of developing mesothelioma by 33%. That is, however, what these selected meta-analyzed data showed.

### Other Bias Issues

The study conducted by Agudo and others, published in 2000, demonstrates how differential exposure determination can bias results when exposure histories of cases (who are dead or too sick to be interviewed directly) are more likely to be determined by surrogate interviews than are exposure histories for controls.[33]

Forty-four percent of cases were deceased at the time of the study, and thus researchers determined their exposures through family-member interviews. Among the control group, however, the researchers directly interviewed all but one participant. Cases, therefore, may have been less likely to be classified as exposed, which would bias the resulting risk ratios to be less than one. In addition, the researchers considered only occupations that had been held for at least six consecutive months, meaning that workers with exposures from part-time or amateur brake jobs were omitted. This random misclassification biased the results of the study towards the null. The authors also assumed *without question* that brake work puts an individual at risk for asbestos exposure, by placing brake mechanics in the "risk of exposure" category in their analysis. The rate ratio for this entire category of asbestos-exposed workers was elevated, at 2.59, but the analysis of a small number of individuals within the category of at-risk occupations (i.e., the brake mechanics) cannot lead to any sound conclusions.

The study published in 1994 by Spirtas and others provides additional evidence that exposure-determination bias is a real threat to study validity.[34] In the study, younger cases had a higher attributable risk for mesothelioma from asbestos exposure than did older cases. This is likely to have resulted from more accurate exposure assessment among younger individuals, who were better able to remember more recent exposure events. Spirtas et al. did not include independent analyses of the members of the cohort who reported "brake lining work or repair" (105 of 741) because of the high rate of multiple asbestos exposures in this group.[34] Unlike the authors of the original study, Wong fails to note these non-brake exposures or the original authors' exclusion of these workers, and relies on these rejected data in his meta-analysis.[6]

The automobile manufacturers paid Hessel et al. to "update" the Spirtas cohort and reanalyze its brake-worker data in 2004.[4] The results of the analysis presented by Hessel and colleagues reveal the methodologic problems with the use of the NIH data set. First, the analysis of Hessel et al. indicated that non-occupational brake work prevented workers from developing mesothelioma (regression beta was –0.184). In addition, their analysis found that higher levels of exposure to asbestos among workers performing occupational brake work were more protective (regression beta was –0.307). In other words, these authors found a dose–response relationship between exposure to asbestos-lined brakes and reduced risk of mesothelioma. Of course, brake work cannot reduce workers' risk for contracting mesothelioma, and it certainly can't do this in a "dose"-dependent manner. The unbelievable dose–response relationship is further evidence that the study suffered from systematic error. Hessel and his colleagues also examined six other job categories of

---

†They found combined RRs of 0.92 (95% CI 0.55–1.56) in Tier I studies and 0.81 (95% CI 0.52–1.28) Tier II studies.

asbestos-exposed workers, all of whom have been found to have developed asbestos-induced mesothelioma or other asbestos-related disease in other studies, including workers exposed to asbestos insulation in furnace or boiler installation or repair,[35,36] building demolition,[37,38] plumbing or heating repair,[39,40] elevator installation or repair,[41] production of asbestos textiles, and production of paper products.[42–45] In contrast to previous cohort studies, Hessel et al. found no increased risk of mesothelioma in workers performing these jobs. They found elevated odds ratios for shipbuilding and repair work (OR 6.04, CI 3.74–9.75) and insulation work (OR 3.38, CI 2.20–5.17). While elevated, these odds ratios are orders of magnitude lower than those found in cohort studies of these same two groups. For example, Selikoff found that about 10% of insulators died from mesothelioma, giving an approximate rate ratio of 1,000.[46] Thus, unless one is willing to believe that brake work protects against mesothelioma and that previous cohort studies of other job categories are wrong, Hessel et al. have provided results indicating that their method biases results to the null and/or reverses actual effects of exposure, turning harmful exposures into beneficial ones.

Teschke et al. used an occupation-classification scheme that may also have biased results towards the null.[47] The authors stated, "In addition, grouping of occupations was likely to result in non-differential misclassification, usually biasing risk estimates to the null value." Wong omitted this critical fact. The study is also another example of differential exposure-determination bias—the authors determined exposure histories for 13.6% of controls' histories of exposure were obtained through next-of-kin interviews, compared with 33% of cases. The study also had a higher non-participation rate among controls, which could lead to selection bias, and interviewers were not blinded to the case–control status of the interviewee, possibly leading to interviewer bias.

The Woitowitz and Rodelsperger study focused solely on the issue of a relationship between automobile mechanic work and mesothelioma.[48] Part of this study is of no value in determining the relationship between any asbestos exposure and mesothelioma because the authors used lung cancer patients as controls. Exposure status is likely to be similar among the control group and the cases, which would lead to little discernable difference in risk between the two groups, despite any real association that may exist between brake work and mesothelioma. Since asbestos exposure is a well-known risk factor for lung cancer, any mesothelioma case–control study with lung cancer patients as the control group will almost certainly produce results at or below the null. This study demonstrates this effect well, since the researchers used "population controls" as well as lung cancer patients as controls. The odds ratio (OR) for "hospital controls" was 0.75, almost half

that for population controls, 1.32. Rather than report both results, Wong presented an average OR of 0.87. Goodman et al. published both ORs but included only the lower average in their meta-analysis.[5,6]

McDonald and McDonald conducted a case–control study, published in 1980, examining mesothelioma cases from Canada and the United States.[49] Like the Woitowitz and Rodelsperger study, this study relied on an inappropriate control group; control subjects were patients in cases diagnosed by pathologists in which "pulmonary metastases were present from a non-pulmonary malignant tumor."[48,49] For example, the control group may have included patients who had died from mesothelioma or other asbestos-induced malignancies such as laryngeal or colon cancer.[50,51] The choice of such controls biased results towards the null. In addition, the study reviewed occupational status only ten years prior to death. Since mesothelioma has a minimum latency period of about ten years, this study did not necessarily address any subject's most relevant exposures. McDonald et al. subsequently compared lung-fiber burdens between control and mesothelioma patients and found no statistically significant difference between the amounts of chrysotile, amosite or crocidolite.[52] This is further evidence that controls were not adequately chosen, since they were clearly exposed to as much asbestos as the 99 mesothelioma patients. This misclassification biases the results to the null.

Both Wong and Goodman et al. ignore other studies that reveal mesothelioma risk to brake-manufacturing workers. Since these authors base their argument for lack of risk on fiber length and the general issue of whether or not chrysotile can ever cause mesothelioma, they are clearly relevant. And while they are also compromised by numerous methodologic and other problems, they do show increased rates of mesothelioma in brake manufacturing workers.[53,54] Dodson has critiqued the "short fiber" argument elsewhere.[55] The risk to brake-manufacturing workers is relevant to the question of risk to brake-repair workers, since the fiber used in the manufacture of brakes is the same length as that in new brakes. If there is relevance to the short-fiber argument at all, it relates to exposures from used brakes. Brake-repair workers are exposed to fibers from both new and used brakes from tooling parts as well as blow-out of brake-wear dust.

In 1982, McDonald and Fry published results of a study of a Connecticut chrysotile asbestos brake-manufacturing factory and concluded that, "The failure to find a single mesothelioma among 1469 deaths in 4738 employees of the largest and oldest asbestos factory in the state suggests that chrysotile in the manufacture of friction products was not responsible for the problem."[54] In a study of three plants including the Connecticut plant, McDonald et al. reported "only" 0.4 cases of mesothelioma per 1,000 individuals in chrysotile asbestos factories over the course of approx-

imately 40 years [1/100,000 or 10 per million per year]. They then asserted that, "This finding supports much other evidence that amphibole are mainly responsible for mesothelioma whereas chrysotile has little or no mesothelioma-producing potential."[54] The authors present this evidence, however, without discussing the expected population rate for comparison. Teta et al. report an expected rate of 2.2 cases per million each year for the total population and 4 per million for Connecticut.[56] Comparisons with expected population rates are also problematic, since at least half of all mesothelioma cases are caused by occupational exposures to asbestos. The unexposed expected rate is no higher than 1 per million.[57] For a true comparison to be drawn, it would have to be with only those cases that were not occupational, since the risk of mesothelioma among automobile mechanics should not be compared with the risk of workers in other occupations known to cause the disease, but with those who were not occupationally exposed. The rate reported by McDonald et al. is therefore at least more than double the expected rate. McDonald's data thus support the claim that chrysotile asbestos causes mesothelioma.

The McDonalds' research suffered from other, more serious problems. In 1983, Teta et al. described findings from the state of Connecticut cancer registry and reported three mesothelioma deaths in the same Connecticut factory and during the same time frame used in the McDonald study.[56] One year after the publication of Teta's paper, in 1984, McDonald et al. published their "final" report on the plant. This "final" report, however, did not report the full data from the original cohort, which included both men and women, but reported data from the male portion of the cohort only.[58] Two "missed cases" occurred in women who were members of McDonald's cohort.[59] McDonald et al. reported that they had found not a single case of mesothelioma in this plant and failed to mention the cases Teta cited from the state of Connecticut registry.[53] In their 1982 paper, McDonald and Fry claimed their data were reliable, in large part due to the existence of the very same registry. They stated, "The opportunity for recognition of mesotheliomas was also very good at the chrysotile friction materials plant, as the state of Connecticut has maintained a renowned cancer register."[54] Clearly this would hold true only if the authors had checked the registry prior to the publication of their paper; unfortunately, it appears that they had not done so.[59,60] Teta et al. claim they informed them of the discrepancy and in 1986 McDonald tried to explain the omission away.[59] McDonald stated that she and her colleagues omitted the cases because mesothelioma had not been indicated on two of the deceaseds' death certificates, the primary measure of outcome in their study, and that they excluded the third case because he had terminated work prior to the beginning date of their study.[59] However, in 1986, by the time McDonald

had commented on these discrepancies, at least two other cases of mesothelioma in the plant had been reported on death certificates (see Table 1, cases 1 and 2). Both fit the initial cohort definition and the first left employment before there was any alleged amphibole use. These cases occurred after the termination date of the McDonald study. We are now aware of at least six additional mesothelioma cases in workers from the plant, four of whom had no other possible exposures to asbestos (Table 1). At least four of these cases are known to the main sponsors of the McDonalds' research, since members of the Quebec Asbestos Mining Association (QAMA) were sued by three of them. Therefore, there were a total of at least nine mesotheliomas in this factory, which used chrysotile until 1957 only.‡ Perhaps by unfortunate coincidence, all of these cases occurred before or after the beginning and ending dates of the McDonalds' studies or the diagnoses were not reported on the death certificates.

Death certificates, in general, are often inadequate means of determining a mesothelioma diagnosis, due to the strong possibility of other related conditions' becoming the primary causes of death (e.g., cardiac arrest) and because mesothelioma is frequently misdiagnosed. Mesothelioma was not added as a specific ICD code until 1968.[61] The study was conducted in the 1970s, mostly examining data from prior decades, in which mesothelioma was a lesser-known disease that was frequently not accurately diagnosed. In addition, the Connecticut registry was an excellent source of data for a comparison of expected and plant rates. To make the data compatible, the registry should have been used to determine the mesothelioma rates for the plant workers. Had they done so, McDonald et al. would not have missed the two mesothelioma cases that occurred during their selected observation period. Of course, the most important result of the exposure to chrysotile at this plant is the death of nine workers from mesothelioma in a population of about 4,500 workers. Although the McDonalds et al. stressed the importance of this cohort in asserting that chrysotile did not cause mesothelioma, these nine cases provide additional evidence that chrysotile causes mesothelioma.

Despite the fact that Teta is a co-author of one of the brake-manufacturer–funded papers and works for the company that generated three of these papers, the brake-manufacturer–funded researchers failed to use any of these studies or data to assess the hazard of exposure to chrysotile-lined brakes.[5,6] Other industry-funded researchers have also failed to use this information in assessing chrysotile risks. Recently, Crump and Berman completed a risk assessment for asbestos for the EPA.[63] To some extent this was an update of a previous assess-

---

‡Some anthophyllite was used beginning in 1957, and about 400 pound of crocidolite were used experimentally in the laboratory from 1964 to 1972.[53]

**TABLE 1—Mesothelioma Case in a Chrysotile Brake Manufacturing Plant**

| | Date of Birth | Date of Diagnosis | Raymark Work Dates | Job Description | Other Exposures | Death Certificate/ Autopsy |
|---|---|---|---|---|---|---|
| Case 1 | | 5/21/1980 | 1926–1937 | Office worker Shipping clerk | None: no known home repair, friction, or additional occupational exposures. | Left lobar pneumonia, mesothelioma |
| Case 2 | | 9/3/1985 | 1940–1985 | Unknown | Unknown | Malignant mesothelioma |
| Case 3 | | 3/24/1994 | 1983–1984 | Unknown | Was also exposed to asbestos in the Navy, and had other occupational exposures including EB, American Linen Supply, Upjohn and U.S. Rubber | Respiratory failure, mesothelioma |
| Case 4 | | 9/16/1996 | 1937–1962 1970–1968 | Plant worker | None: worked in security and sales for other occupations; no known home repair or friction exposure | Respiratory failure, mesothelioma |
| Case 5 | | 5/24/1999 | 1940–1941 | Carding/ spinning room laborer | None: truck driver and woodworker for other occupations | Mesothelioma |
| Case 6 | | 3/14/2000 | 1965–1985 | Machine operator | None: no known home repair, friction or additional occupational exposures | Lung cancer Autopsy report: mesothelioma |

Based on Lewinsohn's[62] Connecticut expected rate of 4 mesothelioma cases per million, the expected number of cases is 1.4, observed number is 9; therefore, the RR is 6.4 and $p < 0.05$.

ment they had done for the Asbestos Information Association, an asbestos industry lobby and public relations front, in 1984.[64] Berman and Crump ignored the published mesothelioma cases from the friction plant that McDonald had acknowledged in 1986, and based their dose–response analysis on the assumption that there were no cases in that plant,

> Perhaps the most interesting of the changes between the 1986 KL value estimates and the current KL value estimates involves the friction products plant in Connecticut (McDonald et al. 1984). Although a relatively small, positive exposure-response was estimated from this study in the 1986 Health Effects Update, the best current estimate is that this is essentially a negative study (no excess risk attributable to asbestos).[63]

Teta served as an official reviewer of Berman and Crump's paper, and although the omitted cases were noted in 1983, along with the need for further follow-up on this cohort, Teta recommended that the EPA adopt the Berman–Crump model before the cohort follow-up was performed.[65] The Berman–Crump model did not incorporate these 1983 data, and we have reported our partial follow-up of this population in this paper. Berman and Crump also relied on dose estimates from QAMA studies about which the authors themselves stated, "It remains doubtful, however, whether conversion [of particle dose estimates, the only measure of exposure in the QAMA studies] to a fibre equivalent can have much epidemiological validity."[66]

### Inadequate Sample Size

Because of the broad nature of most of the studies, examining mesothelioma risks among many different occupational groups, the numbers used by Wong from each study (i.e., the number of garage mechanics in each study) is usually less than 25. Hessel et al. (the highest-rated study in Goodman et al.'s re-analysis) reports an OR for brake workers based on only two cases after "controlling" for insulation and shipbuilding exposure and on a single case after controlling for all other potential asbestos exposures. Any conclusions relative to safety based on these tiny sample sizes are reckless.

### Use of Inappropriate Control Group

It is extremely difficult to find a comparable control group for hospitalized mesothelioma cases. Due to the rarity of the condition, mesothelioma cases are often referred to large medical centers. Some hospital controls who do not have "rare" diseases will not reflect the true demographics of the desired denominator population. Patients with mesothelioma are often referred from rural or suburban to urban hospitals for diagnosis or treatment. Patients from these urban environments are likely to be overrepresented in the control

group and are more likely to have been exposed to brakes than the rural or suburban neighbors of the cases (controls that more accurately reflect the demographics of the cases). This effect helps explain how all but one of the studies Wong and Goodman et al. analyzed found that brake work reduced the risk of the development of mesothelioma.

*Misuse of Confidence Intervals*

Almost all of the studies reviewed report confidence intervals that include a rate ratio greater than one.[5,6] When risk ratios are being calculated on small samples, point estimates cannot be considered particularly accurate, and examination of confidence intervals is more important in determining risk. Wong and Goodman et al., however, mention these confidence intervals only in passing and base their entire analysis on point estimates.

## DISCUSSION

Despite the clear methodologic problems with the above-mentioned studies used in their meta-analyses, Goodman et al. and Wong present them as unquestionable evidence of the absence of an association between brake work and mesothelioma.[5,6] None of the studies used was designed specifically to examine this association, bringing in the possibility that unknown confounders could be at play. Despite this, Wong presents the studies under the heading of "Epidemiologic Studies of Mesothelioma among Auto Mechanics" and Goodman et al. title their paper, "Mesothelioma and Lung Cancer among Motor Vehicle Mechanics: A Meta-analysis." As we have shown, a study that is not designed specifically to determine brake-work exposure is likely to be fraught with bias due to the complexity of exposure determination.

The World Trade Organization issued a ruling on the matter in September 2000, after extensive expert testimony led to a conclusion that chrysotile asbestos does produce a real risk of mesothelioma to mechanics.[67] The ruling allowed European countries to ban the use of asbestos-containing brakes. Both papers omit this information as well.

After publication of Wong's paper but before the publication of that of Goodman et al., considerable evidence emerged from studies conducted in Australia by Leigh et al. supporting an association between automobile mechanic work and mesothelioma. Of the approximately 6,000 individuals in Australia's extensive mesothelioma death registry, 1.2% were automobile mechanics.[68–70] For many, the only source of asbestos exposure was brake-lining repair.[68,69] In a number of individuals examined, only chrysotile asbestos fibers were found, indicating that chrysotile exposure alone can cause malignancy.[69]

On the whole, Wong and Goodman et al. fail to adequately address the issue of the relationship between brake work and mesothelioma. The small numbers of individuals pulled from larger studies, from which Wong reports risk ratios to support his argument, lack statistical power as well as epidemiologic meaning due to the large amount of potential bias. The meta-analyses begin to address the problem of a lack of statistical power. However, since the data used for the analysis are handpicked from the literature to the exclusion of contrary evidence, and those that are included are likely to suffer from various types of bias, the results reported are not reliable. Until prospective cohort studies specifically designed to determine asbestos exposure from brake-lining installation and repair are conducted, definite conclusions about the magnitude of this risk cannot be made. It is clear that a risk exists.[25]

Moreover, the entire argument addressed by these analyses, regarding the risks of chrysotile, is specious in light of the following undisputed facts:

1. Chrysotile causes lung cancer.[72]
2. Chrysotile causes asbestosis.[72–74]
3. Chrysotile used in the United States is contaminated with tremolite—an amphibole.[75]
4. Products made from chrysotile contain tremolite.[76]
5. Chrysotile is concentrated in the pleura.[77]
6. Populations with mixed exposures to amphiboles and chrysotile have double the rate of mesothelioma of those exposed to amphibole alone.[78–80]
7. Brake-repair workers get substantial airborne asbestos exposures from grinding brake and clutch parts and blowing out dust from brake assemblies.[25]

Almost all brake workers have had some exposure to amphibole with, or as well as, chrysotile. Thus, even if chrysotile alone is not a cause of mesothelioma it acts synergistically with amphiboles to increase the incidence of this cancer.

## CONCLUSION

The methods utilized by the asbestos and related industries—the redefinition of scientific criteria for determining cause–effect relationships and the manipulation of scientific data and scientific inferences—have obscured the true picture regarding asbestos exposure and mesothelioma. In contrast to their experts' opinions, the relationship between exposure to asbestos and mesothelioma has long since been recognized by the brake-industry executives who retained Goodman et al. and Wong.[5,6] In his 1973 private presidential address to brake manufacturers, Ike Weaver, the Chairman of the Asbestos Study Committee of the Friction Materials Standards Institute, an industry trade organization, noted the importance of this phenomenon:

> I know of no way any of us can be absolutely sure that his friction products, regardless of whether they are sold as original equipment or on the replace-

ment market, will not be subjected to additional operations or alterations in the field that could result in excessive exposure of workers or bystanders to airborne asbestos fibre. I have been appalled to learn of a number of instances where this problem has occurred, and some of these cases involved people that certainly might have been expected to know better. . . .

If this kind of thing occurs in fabrication operations of major OE [original equipment] customers, it appears to me there can be no argument about the need for educational measures to reduce chances of unnecessary exposure during grinding, drilling, or cutting operations. To those who argue that labeling or other types of warning need not apply to replacement materials because fabricators or appliers handling replacement quantities are exposed relatively intermittently, I say emphatically this just ain't necessarily so! Large volume replacement users present major potential hazards, and even small job shops can needlessly expose people to high fibre concentrations if operations are performed without controls.[81]

Despite the secret industry acknowledgement of risk and high exposures, Goodman et al. and Wong manipulate epidemiologic science to conclude that exposure to asbestos from brakes does not induce asbestos-related malignancies. As we and others have noted, absence of evidence is not evidence of absence; in other words, failing to find an association does not provide any evidence that an association does not exist.[82] Once it is generally accepted that a substance can cause disease in humans, all that is required to establish causation is documentation of exposure to that substance. For example, the OSHA benzene standard did not require epidemiologic evidence of cancer risk in every sector covered by the standard.[83] In the case of vinyl chloride, chemical companies themselves removed the compound as a propellant in hair sprays based on animal studies alone because of the risk of unlimited liability.[84] The asbestos industry and the automobile industry, rather than hiding behind a "dust cloud" of misleading science, should do the same and stop using asbestos in brakes worldwide.

### References

1. Davidson, M. Re: Cause No. 2004-03964 Asbestos Litigation, Judge Davidson. 5. In the District Court, Harris County, Texas 11th Judicial District, in re: Asbestos Litigation Brake Hearing, May 5, 2003.
2. Langer AM, McCaughey WT. Mesothelioma in a brake repair worker. Lancet. 1982;2:1101-3.
3. Paustenbach DJ, Richter RO, Finley BL, Sheehan PJ. An evaluation of the historical exposures of mechanics to asbestos in brake dust. Appl Occup Environ Hyg. 2003;18:786-804.
4. Hessel PA, Teta MJ, Goodman M, Lau E. Mesothelioma among brake mechanics: an expanded analysis of a case–control study. Risk Anal. 2004;24:547-52.
5. Goodman M, Teta MJ, Hessel PA, et al. Mesothelioma and lung cancer among motor vehicle mechanics: a meta-analysis. Ann Occup Hyg. 2004.
6. Wong O. Malignant mesothelioma and asbestos exposure among auto mechanics: appraisal of scientific evidence. Regul Toxicol Pharmacol. 2001;34:170-7.
7. Paustenbach DJ, Finley BL, Lu ET, Brorby GP, Sheehan PJ. Environmental and occupational health hazards associated with the presence of asbestos in brake linings and pads (1900 to present): a "state-of-the-art" review. J Toxicol Environ Health B Crit Rev. 2004;7:25-80.
8. Wong O. Epidemiology of mesothelioma among individuals who work with brakes. Prepared for Allied Signal (Bendix) in the matter of John F. Korotko. October 16, 1998.
9. Egilman D, Kim J, Biklen M. Proving causation: the use and abuse of medical and scientific evidence inside the courtroom—an epidemiologist's critique of the judicial interpretation of the Daubert ruling. Food Drug Law J. 2003;58:223-50.
10. Jones, Day, Revis and Pogue. Corporate Activity Project. <http://tobaccodocuments org/landman/37575 html>. 2005.
11. OSHA Benzene Standard 29 CFR 1910.1028 (c), (e) (1979). <http://www.osha.gov/SLTC/benzene/standards.html>. December 10, 1987.
12. Infante PF. Benzene: an historical perspective on the American and European occupational setting. In: Harremoës P, Gee D, MacGarvin M, et al (eds). Late Lessons from Early Warnings: The Precautionary Principle 1896–2000. Environmental issue report, EEC. 2001.
13. Davidson M. Re: Cause No. 2004-03964; Re: Asbestos litigation. 5-5-2003. In the District Court, Harris County, Texas 11th Judicial District, in re: asbestos litigation brake hearing. January 20, 2004.
14. For Appellees: Lynne Liberto, Houston, TX, Hector H. Cardenas, Austin, TX, R. O. Faulk, Houston, TX, and For Appellants: Richard H. Cardenas, Austin TX. Virginia Hernandez Frias, Individually, and as next friend of Nicholas Brian Frias and Thomas Isaac Frias, George Anthony Frias, Jesse Valentin Frias, Steven Simon Frias, Carlos Jesus Frias, Christina Mejia, and Jose Manuel Galvan, as representative of the estate of Jesus Valentin Frias, *Appellants v. Atlantic Richfield Company, Lyondell Petrochemical Company, and Lyondell-Citgo Refining Company Ltd., Appellees*. 2005. 104 S.W.3d 925; 2003 Tex. App. LEXIS 4115, Court of Appeals of Texas, Fourteenth District, Houston. May 15, 2003.
15. Greenland S. Relation of probability of causation to relative risk and doubling dose: a methodologic error that has become a social problem. Am J Public Health. 1999;89:1166-9.
16. Sox HC. MABMCHKIM. Medical Decision Making. 1st ed. Butterworth-Heinemann, 1998.
17. *Austin v. Kerr-McGee Ref. Corp.* [25 S.W.3d 280; 2000 Tex. App. LEXIS 4317]. 5-16-2000. No. 06-99-00087-CV, Court of Appeals of Texas, Sixth District, Texarkana. June 29, 2000.
18. Mossman BT. Mechanisms of asbestos carcinogenesis and toxicity: the amphibole hypothesis revisited. Br J Ind Med. 1993; 50:673-6.
19. Stayner LT, Dankovic DA, Lemen RA. Occupational exposure to chrysotile asbestos and cancer risk: a review of the amphibole hypothesis. Am J Public Health. 1996;86:179-86.
20. Cullen MR. The amphibole hypothesis of asbestos-related cancer—gone but not forgotten. Am J Public Health. 1996;86:158-9.
21. Mossman BT, Gee JB. Asbestos-related cancer and the amphibole hypothesis. The hypothesis is still supported by scientists and scientific data. Am J Public Health. 1997;87:689-90.
22. Wagner JC. Asbestos-related cancer and the amphibole hypothesis. The first documentation of the association. Am J Public Health. 1997;87:687-8.
23. Langer AM, Nolan RP. Asbestos-related cancer and the amphibole hypothesis. The amphibole hypothesis: neither gone nor forgotten. Am J Public Health. 1997;87:688-9.
24. *Pittsburgh Corning Corporation, Appellant, v. Cecile J. Walters*, individually and as personal representative of the heirs and estate of Douglas F. Walters, deceased, Appellee, Number 13-97-753-CV. [1 S.W.3d 759; 1999 Tex. App. Lexis 5836]. 8-5-1999. Court of Appeals of Texas, Thirteenth District, Corpus Christi. August 5, 1999.
25. Lemen RA. Asbestos in brakes: exposure and risk of disease. Am J Ind Med. 2004;45:229-37.
26. Kauppinen T, Korhonen K. Exposure to asbestos during brake maintenance of automotive vehicles by different methods. Am Ind Hyg Assoc J. 1987;48:499-504.

27. Gustavsson P, Plato N, Lidstrom EB, Hogstedt C. Lung cancer and exposure to diesel exhaust among bus garage workers. Scand J Work Environ Health. 1990;16:348-54.

28. Malker HS, McLaughlin JK, Malker BK, et al. Occupational risks for pleural mesothelioma in Sweden, 1961-79. J Natl Cancer Inst. 1985;74:61-6.

29. Popper KR. The Logic of Scientific Discovery. London, England: Hutchinson, 1959.

30. Weir FW, Meraz LB. Morphological characteristics of asbestos fibers released during grinding and drilling of friction products. Appl Occup Environ Hyg. 2001;16:1147-9.

31. Blake CL, van Orden DR, Banasik M, Harbison RD. Airborne asbestos concentration from brake changing does not exceed permissible exposure limit. Regul Toxicol Pharmacol. 2003; 38:58-70.

32. Hansen ES. Mortality of auto mechanics. A ten-year follow-up. Scand J Work Environ Health. 1989;15:43-6.

33. Agudo A, alez CA, Bleda MJ, et al. Occupation and risk of malignant pleural mesothelioma: a case–control study in Spain. Am J Ind Med. 2000;37:159-68.

34. Spirtas R, Heineman EF, Bernstein L, et al. Malignant mesothelioma: attributable risk of asbestos exposure. Occup Environ Med. 1994;51:804-11.

35. Danielsen TE, Langard S, Andersen A. Incidence of cancer among Norwegian boiler welders. Occup Environ Med. 1996;53:231-4.

36. Kurumatani N, Natori Y, Mizutani R, et al. A historical cohort mortality study of workers exposed to asbestos in a refitting shipyard. Ind Health. 1999;37:9-17.

37. Brown SK. Asbestos exposure during renovation and demolition of asbestos-cement clad buildings. Am Ind Hyg Assoc J. 1987;48:478-86.

38. Yeung P, Rogers A. An occupation–industry matrix analysis of mesothelioma cases in Australia 1980–1985. Appl Occup Environ Hyg. 2001;16:40-4.

39. Englund A. Recent data on cancer due to asbestos in Sweden. Med Lav. 1995;86:435-9.

40. Cantor KP, Sontag JM, Heid MF. Patterns of mortality among plumbers and pipefitters. Am J Ind Med. 1986;10:73-89.

41. Bresniz EA, Gilman MJ, Gracely EJ, Airoldi J, Vogel E, Gefter W. Asbestos-related radiographic abnormalities in elevator construction workers. Am Rev Respir Dis. 1993;147:1341-4.

42. Berry G, Newhouse ML, Wagner JC. Mortality from all cancers of asbestos factory workers in east London 1933–80. Occup Environ Med. 2000;57:782-5.

43. Berry G, de Klerk NH, Reid A, et al. Malignant pleural and peritoneal mesotheliomas in former miners and millers of crocidolite at Wittenoom, Western Australia. Occup Environ Med. 2004;61:e14.

44. Dement JM, Brown DP, Okun A. Follow-up study of chrysotile asbestos textile workers: cohort mortality and case–control analyses. Am J Ind Med. 1994;26:431-47.

45. McDonald AD, Fry JS, Woolley AJ, McDonald JC. Dust exposure and mortality in an American factory using chrysotile, amosite, and crocidolite in mainly textile manufacture. Br J Indl Med. 1983;40:368-74.

46. Selikoff IJ, Seidman H. Asbestos-associated deaths among insulation workers in the United States and Canada, 1967–1987. Ann NY Acad Sci. 1991;643:1-14.

47. Teschke K, Morgan MS, Checkoway H, et al. Mesothelioma surveillance to locate sources of exposure to asbestos. Can J Public Health. 1997;88:163-8.

48. Woitowitz HJ, Rodelsperger K. Mesothelioma among car mechanics? Ann Occup Hyg. 1994;38:635-8.

49. McDonald AD, McDonald JC. Malignant mesothelioma in North America. Cancer. 1980;46:1650-6.

50. Frumkin H, Berlin J. Asbestos exposure and gastrointestinal malignancy review and meta-analysis. Am J Ind Med. 1988;14: 79-95.

51. Smith AH, Handley MA, Wood R. Epidemiological evidence indicates asbestos causes laryngeal cancer. J Occup Med. 1990;32:499-507.

52. McDonald AD, McDonald JC, Pooley FD. Mineral fibre content of lung in mesothelial tumours in North America. Ann Occup Hyg. 1982;26:417-22.

53. McDonald AD, Fry JS, Woolley AJ, McDonald JC. Dust exposure and mortality in an American chrysotile asbestos friction products plant. Br J Ind Med. 1984;41:151-7.

54. McDonald AD, Fry JS. Mesothelioma and the fiber type in three American asbestos factories—preliminary report. Scand J Work Environ Health. 1982;8 suppl 1:53-8.

55. Dodson RF, Atkinson MA, Levin JL. Asbestos fiber length as related to potential pathogenicity: a critical review. Am J Ind Med. 2003;44:291-7.

56. Teta MJ, Lewinsohn HC, Meigs JW, Vidone RA, Mowad LZ, Flannery JT. Mesothelioma in Connecticut, 1955–1977. Occupational and geographic associations. J Occup Med. 1983;25:749-56.

57. Hillerdal G. Mesothelioma: cases associated with non-occupational and low dose exposures. Occup Environ Med. 1999; 56:505-13.

58. McDonald AD, Fry JS, Woolley AJ, McDonald JC. Dust exposure and mortality in an American chrysotile asbestos friction products plant. Br J Ind Med. 1984;41:151-7.

59. McDonald AD. Mesothelioma in Connecticut. J Occup Med. 1986;28:808-9.

60. Teta MJ, Lewinsohn HC, Meigs JW, Vidone RA, Mowad LZ, Flannery JT. Mesothelioma in Connecticut. J Occup Med. 1986;28:808-9.

61. U.S. Department of Health, Education and Welfare, Public Health Service Health Resources Administration. Comparability of Mortality Statistics for the Seventh and Eighth Revisions of the International Classification of Diseases, United States, (Vital and Health Statistics: Series 2, Data from the National Vital Statistics System; no. 66). October 25, 1975. DHEW publication HRA 76-1340.

62. Lewinsohn HC, Meigs JW, Teta MJ, Flannery JT. The influence of occupational and environmental asbestos exposure on the incidence of malignant mesothelioma in Connecticut. IARC Sci Publ. 1980;655-60.

63. Berman DW, Crump K. Final draft: Technical Support Document for a Protocol to Assess Asbestos-related Risk. EPA #9345. April 6, 2003. EPA.

64. Crump K. Crump's slides used during Testimony for the Asbestos Information Association. Exhibit 237B OSHA H-033C docket. July 9, 1984.

65. Eastern Research Group, Inc. Report on the Peer Consultation Workshop to Discuss a Proposed Protocol to Assess Asbestos-Related Risk. EPA Contract No. 68-C-98-148. May 30, 2003. <http://www.epa.gov/superfund/programs/risk/asbestos/pdfs/asbestos_report.pdf>.

66. McDonald JC. Asbestosis in chrysotile mines and mills. In: Bogovski P (ed). Biological Effects of Asbestos; Proceedings of a Working Conference. Lyon, France, IARC Scientific Publications, 1973.

67. Report of the panel. European Communities—Measures affecting asbestos and asbestos-containing products. WT/DS135/R. World Trade Organization, September 18, 2000.

68. Leigh J, Davidson P, Hendrie L, Berry D. Malignant mesothelioma in Australia, 1945–2000. Am J Ind Med. 2002;41:188-201.

69. Leigh J, Driscoll T. Malignant mesothelioma in Australia, 1945–2002. Int J Occup Environ Health. 2003;9:206-17.

70. Henderson DW, Jones ML, de Klerk N, et al. The diagnosis and attribution of asbestos-related diseases in an Australian context: report of the Adelaide Workshop on Asbestos-Related Diseases, October 6–7, 2000. Int J Occup Environ Health. 2004;10:40-6.

71. McDonald JC. Asbestos and lung cancer: has the case been proven? Chest. 1980;78:374-6.

72. Becklake MR, Fournier-Massey G, Rossiter CE, McDonald JC. Lung function in chrysotile asbestos mine and mill workers of Quebec. Arch Environ Health. 1972;24:401-9.

73. Liddell D, Eyssen G, Thomas D, McDonald C. Radiological changes over 20 years in relation to chrysotile exposure in Quebec. Inhaled Part. 1975;4 Pt 2:799-813.

74. Rossiter CE, Bristol LJ, Cartier PH, et al. Radiographic changes in chrysotile asbestos mine and mill workers of Quebec. Arch Environ Health. 1972;24:388-400.

75. Sebastien P, McDonald JC, McDonald AD, Case B, Harley R. Respiratory cancer in chrysotile textile and mining industries: exposure inferences from lung analysis. Br J Ind Med. 1989; 46:180-7.

76. Oral deposition of William Longo. 5-23-2005. In the District Court, Harris County, Texas 11th Judicial District, in re: Asbestos Litigation Chrysotile Hearing.

77. Suzuki Y, Yuen SR. Asbestos tissue burden study on human malignant mesothelioma. Ind Health. 2001;39:150-60.

78. Seidman H, Selikoff IJ, Gelb SK. Mortality experience of amosite asbestos factory workers: dose–response relationships 5 to 40 years after onset of short-term work exposure. Am J Ind Med. 1986;10:479-514.

79. Selikoff IJ, Hammond EC, Seidman H. Mortality experience of insulation workers in the United States and Canada, 1943–1976. Ann NY Acad Sci. 1979;330:91-116.

80. Acheson ED, Gardner MJ. Mesothelioma and exposure to mixtures of chrysotile and amphibole asbestos. Arch Environ Health. 1979;34:240-2.

81. Address of IW Weaver, "Asbestos and the Friction Material Industry," given at the Annual Membership of the Asbestos Textile Institute on June 27, 1973, reported in the minutes of the meeting, 2005.

82. Alderson P. Absence of evidence is not evidence of absence. BMJ. 2004;328:476-7.

83. OSHA Benzene Standard, 2005.

84. Markowitz GE, Rosner D. Deceit and Denial. The Deadly Politics of Industrial Pollution. Berkeley, CA: University of California Press, 2002.

Page 30 of 73



ABOUT US      CONTACT US

Search Legal Voice

OUR WORK    |    TOOLS & RESOURCES    |    VOLUNTEER    |    EVENTS    |    NEWS              DONATE

*ABUSIVE LITIGATION: WHEN YOUR ABUSER EXPLOITS THE LEGAL SYSTEM*

*Updated January 2021*
**View or Download PDF**

### What Is "Abusive Litigation"?

Abusive litigation is when someone uses the legal system to take power and control over you. It is common in domestic violence cases.

Even if you have left your abuser, he or she can cause psychological, emotional, and financial harm by taking you—and even your friends and relatives —to court again and again.

### What Counts as Abusive Litigation?

Abusive litigation can come up in several types of cases, including family law, protection orders, and unnecessary ("frivolous") lawsuits.

Common forms of abusive litigation are:
- Filing for protection orders against you and/or your friends or family.
- Starting custody battles.
- Filing contempt motions against you for no reason.
- Describing you as an unfit parent and/or requesting mental health evaluations.
- Filing unnecessary ("frivolous") motions, appeals, motions for revision, or motions for reconsideration, forcing you back into court.
- Trying to bring closed cases back into court ("relitigate").
- Trying to relitigate in different courts (switching jurisdictions).
- Using the court's discovery requests and/or using the discovery process to bring up embarrassing or irrelevant information about you, and/or taking up a lot of your time and money with large discovery requests.
- Dragging out court hearings, harming you financially and/or emotionally.
- Refusing to obey court orders, forcing you to spend time and money to enforce the orders.

- Threatening to report you to immigration authorities.
- Making false reports to Child Protective Services (CPS).
- Falsely claiming you abuse drugs or alcohol.
- Suing you for reporting abuse.
- Suing or threatening to sue anyone who helps you, including family, friends, advocates, attorneys, and law enforcement officers.
- Filing complaints against the judge or your lawyer.

## Can Abusive Litigation Be Stopped?

Judges can help stop abusive litigation with a specific court order: *Order Restricting Abusive Litigation.*

The *Order Restricting Abusive Litigation* can:
- Prohibit abusive litigants from filing new lawsuits without the court's authorization.
- Limit the number of allowable court filings.
- Limit the scope of discovery.
- Require abusive litigants to post a bond for lawyers' fees.
- Impose sanctions.
- Impose conditions on—or prohibit—appeals.

## What Can I Do to Make It Stop?

If you are experiencing abusive litigation, notify the court and ask the court to take action. You or your lawyer can file a *Motion to Restrict Abusive Litigation* along with a proposed *Order on Motion to Restrict Abusive Litigation*. See Resources below for links to these forms.

If the judge is not familiar with abusive litigation, you may want to refer him or her to "Abusive Litigation and Domestic Violence Survivors," Appendix H in the *Domestic Violence Manual for Judges*. It has extensive information about this topic. Family Law judges should have this manual. See Resources below.

## Resources

- "Abusive Litigation and Domestic Violence Survivors," by Legal Voice (Appendix H of the *Domestic Violence Manual for Judges*)

- Court forms
  - *Motion to Restrict Abusive Litigation*
  - *Order on Motion to Restrict Abusive Litigation*

- Related Publications from Legal Voice
  - *How to Find a Lawyer and Other Legal Resources in Washington State*
  - *How to Protect Your Privacy in Court Files*

- Washington State law: RCW 26.51, Abusive Litigation – Domestic Violence

Abusive Litigation

This publication provides general information concerning your rights and responsibilities. It is not intended as a substitute for specific legal advice.
This information is current as of December 2016. Updated by Chloe Phalan and Catherine West.
Acknowledgment to Erica Franklin for her work on previous versions of this memo. © 2021 Legal Voice

**(Permission for copying and distribution granted to the Alliance for Equal Justice and to individuals for non-commercial purposes only.)**

© 2012-2021 Legal Voice. All rights reserved.
907 Pine Street, Suite 500 | Seattle, WA 98101
Privacy Policy | Site Map



**Stay informed:**
Sign up for our email list

WIKIPEDIA

# Emotional blackmail

**Emotional blackmail** and **FOG** are terms, popularized by psychotherapist Susan Forward, about controlling people in relationships and the theory that fear, obligation and guilt (FOG) are the transactional dynamics at play between the controller and the person being controlled. Understanding these dynamics is useful to anyone trying to extricate oneself from the controlling behavior of another person and deal with their own compulsions to do things that are uncomfortable, undesirable, burdensome, or self-sacrificing for others.[1]

## Contents

**General**

**Types**

**Patterns and characteristics**
    Addictions
    Mental illness
    Codependency
    Affluenza and children
    Assertiveness training

**Recovery**

**Cultural examples**

**Criticism**

**See also**

**References**

# General

The first documented use of "emotional blackmail" appeared in 1947 in the *Journal of the National Association of Deans of Women* in the article "Emotional Blackmail Climate". The term was used to describe one type of problematic classroom control model often used by teachers.[2] Esther Vilar, an Argentine physician, also used the term "emotional blackmail" in the early 1970s to describe a parenting strategy observed among some mothers with multiple children.[3]

Emotional blackmail typically involves two people who have established a close personal or intimate relationship (parent and child, spouses, siblings, or two close friends).[4] Children, too, will employ special pleading and emotional blackmail to promote their own interests, and self-development, within the family system.[5]

Emotional blackmailers use fear, obligation and guilt in their relationships, ensuring that others feel afraid to cross them, obligated to give them their way and swamped by guilt if they resist. Knowing that someone close to them wants love, approval or confirmation of identity and self-esteem, blackmailers may threaten to withhold them (e.g., withhold love) or take them away altogether, making the second person feel they must earn them by agreement.[6] Fear, obligation or guilt is commonly referred to as "FOG". FOG is a contrived acronym—a play on the word "fog" which describes something that obscures and confuses a situation or someone's thought processes.

The person who is acting in a controlling way often wants something from the other person that is legitimate to want. They may want to feel loved, safe, valuable, appreciated, supported, needed, etc. This is not the problem. The problem is often more a matter of how they are going about getting what they want, or that they are insensitive to others' needs in doing so that is troubling—and how others react to all of this.[1]

Under pressure, one may become a sort of hostage, forced to act under pressure of the threat of responsibility for the other's breakdown.[7] One could fall into a pattern of letting the blackmailer control his/her decisions and behavior, lost in what Doris Lessing described as "a sort of psychological fog".[8]

# Types

Forward and Frazier identify four blackmail types each with their own mental manipulation style:[9]

| Type | Example |
|---|---|
| **Punisher's threat** | Eat the food I cooked for you or I'll hurt you. |
| **Self-punisher's threat** | Eat the food I cooked for you or I'll hurt myself. |
| **Sufferer's threat** | Eat the food I cooked for you. I was saving it for myself. I wonder what will happen now. |
| **Tantalizer's threat** | Eat the food I cooked for you and you just may get a really yummy dessert. |

There are different levels of demands—demands that are of little consequence, demands that involve important issues or personal integrity, demands that affect major life decisions, and/or demands that are dangerous or illegal.[1]

Emotional blackmail - Wikipedia

# Patterns and characteristics

## Addictions

Addicts often believe that being in control is how to achieve success and happiness in life. People who follow this rule use it as a survival skill, having usually learned it in childhood. As long as they make the rules, no one can back them into a corner with their feelings.[10]

## Mental illness

People with certain mental conditions are predisposed to controlling behavior including those with paranoid personality disorder,[11] borderline personality disorder,[12] and narcissistic personality disorder.[13]

People with borderline personality disorder are particularly likely to use emotional blackmail[12] (as too are destructive narcissists).[13] However, their actions may be impulsive and driven by fear and a desperate sense of hopelessness, rather than being the product of any conscious plan.[14]

## Codependency

Codependency often involves placing a lower priority on one's own needs, while being excessively preoccupied with the needs of others. Codependency can occur in any type of relationship, including family, work, friendship, and also romantic, peer or community relationships.[15]

## Affluenza and children

Affluenza—the status insecurity derived from obsessively keeping up with the Joneses—has been linked by Oliver James to a pattern of childhood training whereby sufferers were "subjected to a form of emotional blackmail as toddlers. Their mothers' love becomes conditional on exhibiting behaviour that achieved parental goals."[16]

## Assertiveness training

Assertiveness training encourages people to not engage in fruitless back-and-forths or power struggles with the emotional blackmailer but instead to repeat a neutral statement, such as "I can see how you feel that way," or, if pressured to eat, say "No thank you, I'm not hungry." They are taught to keep their statements within certain boundaries in order not to capitulate to coercive nagging, emotional blackmail, or

bullying.[17]

# Recovery

抵制情感敲诈的技巧包括加强人际界限，抵制需求，制定权力声明（决心承受压力）以及花时间打破旧模式。重新连接勒索者已否决的自我自治部分不一定很容易。[9]即使您承认内as是诱发性和非理性的，也可能基于情感敲诈而感到内；[18]但仍然能够抵制过度补偿，并忽略勒索者发脾气而引起注意的企图。[19]

但是，以友好的方式始终不理会这种操纵可能会导致操纵的加剧和分离的威胁，[20]或被指控为"疯狂"或"家庭破坏者"。[9]

## 文化实例

- 安吉拉·卡特（Angela Carter）将《美女与野兽》描述为美化了野兽方面的情感敲诈，以此来控制自己的目标美女。[21]
- 小说家多丽丝·莱辛（Doris Lessing）声称："到五岁时，我就成为了勒索的专家。"[22]

## 批评

丹尼尔·米勒（Daniel Miller）反对，在通俗心理学中，情感勒索的想法已被滥用为抵制任何形式的同情或对他人的考虑的辩护。[23]

用诸如"勒索"和"操纵"之类的煽动性术语来标记这种动态可能没有什么用处，因为它既是两极分化的，又意味着预谋和恶意，通常不是这种情况。控制行为和被控制是两个人之间的交易，两者都在起作用。[1]

## 另请参阅

- 滥用权力与控制权
- 诉诸情感
- 相互依存
- 强制说服
- 双重约束

- 家庭关系
- 内trip之旅
- 智力游戏
- 劝说
- 惩罚（心理学）

## 参考

1. Johnson，R.Skip（2014年8月16日）。"情感敲诈：恐惧，义务和罪恶（FOG）"（http://bpdfamily.com/content/emotion al-blackmail-fear-obligation-and-guilt-fog）。BPDFamily.com。于2014年10月18日检索。

2. "未知"。全国妇女院长协会会报。11-12：10。1947年。引用使用通用标题（**帮助**）

3. "为了使顺服灌输给独生子女，母亲必须发展复杂的方法以使其聪明并说服它，并使其明白原因；否则就必须受到惩罚。由于这是令人讨厌的事情，母亲通常将其留给父亲。另一方面，可以通过情感敲诈来训练几个孩子，因为它们都取决于母亲的同意，所以她只需要稍微偏爱一个孩子，其他孩子就会做任何她告诉他们的事情。一直担心它的母亲会"撤回"她的爱，并把爱交给别人。"比利亚尔，埃丝特（1972）。被操纵的人，矮脚鸡/法拉尔，施特劳斯和吉鲁公司

4. Stanlee Phelps / Nancy Austin，《自信的女人》（1987）p.133

5. Nigel Rapport编辑，英国主题（Oxford 2002）p.141

6. Gavin Miller，RD Laing（2004）p.52

7. **吉恩・鲍德里亚，水晶的复仇** (https://books.google.com/books?id=lKvjtv31AqoC&pg=PA174&lpg=PA174) （1999）p.174

8. Doris Lessing，金黄笔记本（1973）p.554

9. 苏珊・前进（Susan Forward）/唐娜·弗雷泽（Donna Frazier），《情感敲诈》（伦敦，1997年）p.28、82、145、169

10. Fenley，Jr.，James L.在痛苦中寻找目的（2012）

11. Goldberg，MD，Joseph（2014年5月23日）。"偏执型人格障碍" (http://webmd.com/mental-health/paranoid-personality-disorder)。于2014年10月20日检索。(http://webmd.com/mental-health/paranoid-personality-disorder)

12. Braiker，Harriet B.，谁在拉弦乐？如何打破操纵周期（2006）

13. 妮娜·布朗（Nina W.Brown），《自我吸收的孩子》（Children of the Self-Absorbed）（2008）35

14. Blaise A. Aguirre，《青少年人际交往性障碍》（2007年），第3页。73-4

15. **Codepends Anonymous：模式和特性** (http://www.coda.org/tools4recovery/Patterns2-2011.htm) 存档于 (https://web.archive.org/web/20130824075736/http://www.coda.org/tools4recovery/Patterns2-2011.htm)2013-08-24，在Wayback Machine上

16. 奥利弗詹姆斯，长沙发上的英国（伦敦1998）p.66

17. Sue Bishop，《发展你的自信》（2006年），第3页。13

18. 玛丽・巴恩斯和约瑟夫・伯克，玛丽・巴恩斯（1974）p.284

19. 卡尔·罗杰斯（Carl Rogers），《成为一个人》（1961）。320

20. 罗宾·斯金纳/约翰·克莱斯（John Cleese），《生活以及如何生存》（伦敦1993）p.349和p.352

21. 艾登天，安吉拉卡特：理性玻璃（1998）p.138

22. 盖尔，绿色，多丽丝・莱辛：变化的诗学（1997）p.9

23. **丹尼尔・米勒，事的舒适** (https://books.google.com/books?id=yxkrED7hVuIC&pg=PA41&lpg=PA41) （2008）p.41

Retrieved from "https://en.wikipedia.org/w/index.php?title=Emotional_blackmail&oldid=996249463"

This page was last edited on 25 December 2020, at 12:20 (UTC).

Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

WIKIPEDIA

# Obfuscation

**Obfuscation** is the obscuring of the intended meaning of communication by making the message difficult to understand, usually with confusing and ambiguous language. The obfuscation might be either unintentional or intentional (although intent usually is connoted), and is accomplished with circumlocution (talking around the subject), the use of jargon (technical language of a profession), and the use of an argot (ingroup language) of limited communicative value to outsiders.[1]

In expository writing, unintentional obfuscation usually occurs in draft documents, at the beginning of composition; such obfuscation is illuminated with critical thinking and editorial revision, either by the writer or by an editor. Etymologically, the word *obfuscation* derives from the Latin *obfuscatio*, from *obfuscāre (to darken)*; synonyms include the words beclouding and abstrusity.

## Contents

Background

Eschew

Secure communication

White box cryptography

Network security

In popular culture

See also

References

External links

# Background

Doctors are faulted for using jargon to conceal unpleasant facts from a patient; the American author and physician Michael Crichton said that medical writing is a "highly skilled, calculated attempt to confuse the reader". The psychologist B. F. Skinner said that medical notation is a form of multiple audience control, which allows the doctor to communicate to the pharmacist things which the patient might

oppose if they could understand medical jargon.[2]

# Eschew

"Eschew obfuscation", also stated as "eschew obfuscation, espouse elucidation", is a humorous fumblerule used by English teachers and professors when lecturing about proper writing techniques. Literally, the phrase means "avoid being unclear" or "avoid being unclear, support being clear", but the use of relatively uncommon words causes confusion in much of the audience (those lacking the vocabulary), making the statement an example of irony, and more precisely a heterological phrase. The phrase has appeared in print at least as early as 1959, when it was used as a section heading in a NASA document.[3]

An earlier similar phrase appears in Mark Twain's *Fenimore Cooper's Literary Offenses*, where he lists rule fourteen of good writing as "eschew surplusage".

# Secure communication

Obfuscation of oral or written communication achieves a degree of secure communication without a need to rely upon technology. This technique is sometimes referred to as "talking around" and is a form of security through obscurity.

A notable example of obfuscation of written communication is a message sent by September 11 attacks ringleader Mohamed Atta to other conspirators prior to the attacks occurring:[4]

> The semester begins in three more weeks. We've obtained 19 confirmations for studies in the faculty of law, the faculty of urban planning, the faculty of fine arts and the faculty of engineering.
>
> — Mohamed Atta

In this obfuscated message, the following code words are believed to exist:[5]

- "semester" refers to planned September 11 attacks
- "three more weeks" refers to the date when the attacks are scheduled
- "19 confirmations" refers to the Hijackers in the September 11 attacks
- "faculty of law" refers to a target, the United States Capitol
- "faculty of urban planning" refers to a target, the World Trade Center
- "faculty of fine arts" refers to a target, the White House
- "faculty of engineering" refers to a target, The Pentagon

Within the illegal drug trade, obfuscation is commonly used in communication to hide the occurrence of drug trafficking. A notable example is the use of "420" as a code word to refer to cannabis consumption, an activity which despite legalisation changes, was once illegal in most jurisdictions. The Drug Enforcement Administration reported in July 2018 a total of 353 different code words used for cannabis.[6]

# White box cryptography

In white-box cryptography, obfuscation refers to the protection of cryptographic keys from extraction when they are under the control of the adversary, e.g., as part of a DRM scheme.[7]

# Network security

In network security, obfuscation refers to methods used to obscure an attack payload from inspection by network protection systems.

# In popular culture

- In Animal Farm, the pigs such as Squealer and Snowball use obfuscation to confuse the other animals with doublespeak in order to prevent any uprisings.

# See also

- Black box
- Cant (language)
- Code word (figure of speech)
- Doublespeak
- Fallacy of quoting out of context
- Fuzzy concept
- Mind games
- Obfuscated code
- Plain English
- Politics and the English Language
- Propaganda
- Steganography
- Verbosity

# References

1. The Oxford Companion to the English Language, Tom McArthur, Ed., (1992) p. 543.
2. Skinner, B.F. (1957) Verbal Behavior p. 232

3. United States National Aeronautics and Space Administration, NASA Technical Memorandum (1959), p. 171.

4. "Virtual soldiers in a holy war" (https://www.haaretz.com/1.5122300). Haaretz.com. Retrieved 2020-06-25.

5. Sirohi, Dr M. N. (2015). Cyber Terrorism and Information Warfare (https://www.worldcat.org/oclc/920167233). New Delhi: Vij Books India Private Limited. ISBN 978-81-931422-1-9. OCLC 920167233 (https://www.worldcat.org/oclc/920167233).

6. "Slang Terms and Code Words: A Reference for Law Enforcement Personnel" (https://www.dea.gov/sites/default/files/2018-07/DIR-022-18.pdf) (PDF). Drug Enforcement Administration. Retrieved 2020-06-26.

7. Chow S, Eisen P, Johnson H, et al. A white-box DES implementation for DRM applications[M]//Digital Rights Management. Springer Berlin Heidelberg, 2002: 1-15.

# External links

- Media related to Obfuscation at Wikimedia Commons

Retrieved from "https://en.wikipedia.org/w/index.php?title=Obfuscation&oldid=1011113978"

This page was last edited on 9 March 2021, at 02:42 (UTC).

Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

WIKIPEDIA

# Victim playing

**Victim playing** (also known as **playing the victim**, **victim card**, or **self-victimization**) is the fabrication or exaggeration of victimhood for a variety of reasons such as to justify abuse of others, to manipulate others, a coping strategy, attention seeking or diffusion of responsibility. A person who repeatedly does this is known as a 'professional victim'.

| **Contents** |
|---|
| **For abuse** |
| **For manipulation** |
| **Other goals** |
| **In corporate life** |
| **Underlying psychology** |
| **See also** |
| **References** |
| **External links** |

## For abuse

Victim playing by abusers is either:[1][2]

- Dehumanization, diverting attention away from acts of abuse by claiming that the abuse was justified based on another person's bad behavior (typically the victim).
- Grooming for abusive power and control by soliciting sympathy from others in order to gain their assistance in supporting or enabling the abuse of a victim (known as proxy abuse).

It is common for abusers to engage in victim playing. This serves two purposes:

- Justification, to themselves, in transactional analysis known as existential validation, as a way of dealing with the cognitive dissonance that results from inconsistencies between the way they treat others and what they believe about themselves.
- Justification to others as a strategy of evading or deflecting harsh judgment or condemnation they may fear from others.

## For manipulation

Manipulators often play the victim role ("woe is me") by portraying themselves as victims of circumstances or someone else's behavior in order to gain pity or sympathy or to evoke compassion and thereby get something from someone. Caring and conscientious people cannot stand to see anyone suffering, and the manipulator often finds it easy and rewarding to play on sympathy to get cooperation.[3]

While portraying oneself as a victim can be highly successful in obtaining goals over the short-term, this method tends to be less successful over time:

> Victims' talent for high drama draws people to them like moths to a flame. Their permanent dire state brings out the altruistic motives in others. It is difficult to ignore constant cries for help. In most instances, however, the help given is of short duration. And like moths in a flame, helpers quickly get burned; nothing seems to work to alleviate the victims' miserable situation; there is no movement for the better. Any efforts rescuers make are ignored, belittled, or met with hostility. No wonder that the rescuers become increasingly frustrated — and walk away.[4]

## Other goals

Victim playing is also:

- An attention seeking technique (see for example Münchausen syndrome).

## In corporate life

The language of "victim playing" has entered modern corporate life, as a potential weapon of all professionals.[5] To define victim-players as dishonest may be an empowering response;[6] as too may be awareness of how childhood boundary issues can underlie the tactic.[7]

In the hustle of office politics, the term may however be abused so as to penalize the legitimate victim of injustice, as well as the role-player.

## Underlying psychology

Transactional analysis distinguishes real victims from those who adopt the role in bad faith, ignoring their own capacities to improve their situation.[8] Among the predictable interpersonal "games" psychiatrist Eric Berne identified as common among by victim-players are "Look How Hard I've Tried" and "Wooden Leg".[9]

R. D. Laing considered that "it will be difficult in practice to determine whether or to what extent a relationship is collusive" – when "the one person is predominantly the passive 'victim'",[10] and when they are merely playing the victim. The problem is intensified once a pattern of victimization has been internalised, perhaps in the form of a double bind.[11]

Object relations theory has explored the way possession by a false self can create a permanent sense of victimisation[12] – a sense of always being in the hands of an external fate.[13]

To break the hold of the negative complex, and to escape the passivity of victimhood, requires taking responsibility for one's own desires and long-term actions.[14]

## See also

- Abusive power and control
- Abuse defense
- Blame
- Buck passing
- Causality
- Causation (law)
- Cognitive distortion
- Contributory negligence
- Determinism
- Emotional blackmail

- Exaggeration
- Gaslighting
- Guilt trip
- Identified patient
- Karpman drama triangle
- Learned helplessness
- Let the Wookiee win
- Mind games
- Necessity defense (New York)
- Persecutory delusion
- Rachel Dolezal § Police reports about alleged hate crimes
- Self blame
- Sob story
- *Spoilt Rotten*
- Victim blaming
- Victim feminism
- Victim mentality
- Victimisation
- Victimology

# References

1. Bailey-Rug C (2015) Life After Narcissistic Abuse
2. Bailey-Rug C (2016) It's Not You, It's Them: When People Are More Than Selfish
3. Simon, George K (1996). *In Sheep's Clothing: Understanding and Dealing with Manipulative People*. ISBN 978-0-9651696-0-8.
4. Manfred F.R. Kets de Vries (2014). Are you a victim of the victim syndrome? Organizational Dynamics 43, pp 130-137 https://dx.doi.org/10.1016/j.orgdyn.2014.03.007
5. Susan A. DePhillips, *Corporate Confidential* (2005) p. 65
6. Anthony C. Mersino, *Emotional Intelligence for Project Managers* (2007) p. 60 and p. 43
7. Mersino, p. 104
8. Petruska Clarkson, *Transactional Analysis in Psychotherapy* (London 1997) p. 217
9. Eric Berne, *Games People Play* (Penguin 1964) p. 92 and p. 141-2
10. R. D. Laing, *Self and Others* (Penguin 1969) p. 108
11. Laing, p. 145
12. Neville Symington, *Narcissism: A New Theory* (London 1993) p. 116
13. Michael Parsons, *The Dove that Returns, the Dove that Vanishes* (London 2000) p. 34
14. Pauline Young-Eisendrath, *Women and Desire* (London 2000) p. 201 and p. 30

- Anthony C. Mersino, Emotional Intelligence for Project Managers; The People Skills You Need to Succeed (2012) p. 60 and p. 43

# External links

- *Booknotes* interview with Charles Sykes on *A Nation of Victims: The Decay of the American Character*, November 29, 1992 (https://www.c-span.org/video/?35197-1/nation-victims)

Retrieved from "https://en.wikipedia.org/w/index.php?title=Victim_playing&oldid=1017796962"

This page was last edited on 14 April 2021, at 17:05 (UTC).

Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

WIKIPEDIA

# Victim mentality

**Victim mentality** is an acquired personality trait in which a person tends to recognize or consider themselves as a victim of the negative actions of others, and to behave as if this were the case in the face of contrary evidence of such circumstances. Victim mentality depends on clear thought processes and attribution. In some cases, those with a victim mentality have in fact been the victim of wrongdoing by others or have otherwise suffered misfortune through no fault of their own. However, such misfortune does not necessarily imply that one will respond by developing a *pervasive and universal* victim mentality where one frequently or constantly perceives oneself to be a victim.[1]

The term is also used in reference to the tendency for blaming one's misfortunes on somebody else's misdeeds, which is also referred to as victimism.[2][3]

Victim mentality is primarily developed, for example, from family members and situations during childhood. Similarly, criminals often engage in victim thinking, believing themselves to be moral and engaging in crime only as a reaction to an immoral world and furthermore feeling that authorities are unfairly singling them out for persecution.[4]

## Contents

Foundations

Features

Victims of abuse and manipulation

Breaking out

Trauma and victimhood

Politics

See also

References

Bibliography

## Foundations

In the most general sense, a victim is anyone who experiences injury, loss, or misfortune as a result of some event or series of events.[5] This negative experience, however, is insufficient for the emergence of a sense of victimhood. Individuals may identify as a victim[1] if they believe that:

- they were harmed;
- they were not the cause of the occurrence of the harmful act;
- they were under no obligation to prevent the harm;
- the harm constituted an injustice in that it violated their rights (if inflicted by a person), or they possessed qualities (*e.g.*, strength or goodness of character) making them persons whom that harm did not befit;
- they deserve sympathy.[6]

The desire for empathy is crucial in that the mere experience of a harmful event is not enough for the emergence of the sense of being a victim. In order to have this sense, there is the need to perceive the harm as undeserved, unjust and immoral, an act that could not be prevented by the victim. The need to obtain empathy and understanding can then emerge.[7]

Individuals harbouring a victim mentality would believe that:[1]

- their lives are a series of challenges directly aimed at them;
- most aspects of life are negative and beyond their control;
- because of the challenges in their lives, they deserve sympathy;
- as they have little power to change things, little action should be taken to improve their problems.

Victim mentality is often the product of violence. Those who have it usually had an experiences of crisis or trauma at its roots.[8] In essence, it is a method of avoiding responsibility and criticism, receiving attention and compassion, and evading feelings of genuine anger.

# Features

A victim mentality may manifest itself in a range of different behaviours or ways of thinking and talking:

- Identifying others as the cause for an undesired situation and denying a personal responsibility for one's own life or circumstances.[9]
- Exhibiting heightened attention levels (hypervigilance) when in the presence of others.
- Awareness of negative intentions of other people.
- Believing that other people are generally more fortunate.
- Gaining relief from feeling pity for oneself or receiving sympathy from others.

It has been typically characterized by attitudes of pessimism, self-pity, and repressed anger.[10] People with victim mentality may develop convincing and sophisticated explanations in support of such ideas, which they then use to explain to themselves and others of their situation.

People with victim mentality may also be generally:

- exhibiting a general tendency to realistically perceive a situation; yet may lack an awareness or curiosity about the root of actual powerlessness in a situation[11]
- introspective
- likely to display entitlement and selfishness.[12]
- defensive: In conversation, reading a negative intention into a neutral question and reacting with a corresponding accusation, hindering the collective solution of problems by recognizing the inherent conflict.
- categorizing: tending to divide people into "good" and "bad" with no gray zone between them.[9]
- unadventurous: generally unwilling to take even small and calculated risks; exaggerating the importance or likelihood of possible negative outcomes.
- exhibiting learned helplessness: underestimating one's ability or influence in a given situation; feeling powerless.
- self-abasing: Putting oneself down even further than others are doing.

A victim mentality may be reflected by linguistic markers or habits, such as pretending

- not to be able to do something ("I can't..."),
- not to have choices ("I must...", "I have no choice..."), or
- epistemological humility ("I don't know").

Other features of a victim mentality include:[13]

- Need for recognition – the desire for individuals to have their victimhood recognized and affirmed by others. This recognition helps reaffirm positive basic assumptions held by the individual about themselves, others and the world in general. This also implies that offenders recognize their wrongdoing. At a collective level this can encourage people to have a positive well-being with regards to traumatic events and to encourage conciliatory attitudes in group conflicts.
- Moral elitism – the perception of the moral superiority of the self and the immorality of the other side, at both individual and group levels. At an individual level this tends to involve a "black and white" view of morality and the actions of individuals. The individual denies their own aggressiveness and sees the self as weak and persecuted by the morally impure, while the other person is seen as threatening, persecuting and immoral, preserving the image of a morally pure self. At a collective level, moral elitism means that groups emphasize the harm inflicted on them, while also seeing themselves as morally superior. This also means that individuals see their own violence as justified and moral, while the outgroup's violence is unjustified and morally wrong.
- Lack of empathy – because individuals are concerned with their own suffering, they tend to be unwilling to divert interest to the suffering of others. They will either ignore the suffering others or act more selfishly. At the collective level, groups preoccupied with their own victimhood are unwilling to see the outgroup's perspective and show less empathy to their adversaries, while being less likely to accept responsibility for harms they commit. This results in the group being collectively egoistic.
- Rumination – victims tend to focus attention on their distress and its causes and consequences rather than solutions. This causes aggression in response to insults or threats and decreases a desire for forgiveness by including a desire for revenge against the perpetrator. Similar dynamics play out at the collective level.

## Victims of abuse and manipulation

Victims of abuse and manipulation often get trapped into a self-image of victimisation. The psychological profile of victimisation includes a pervasive sense of helplessness, passivity, loss of control, pessimism, negative thinking, strong feelings of guilt, shame, self-blame and depression. This way of thinking can lead to hopelessness and despair.[14] It may take a long period of time for therapists to build a trusting relationship with a victim. There frequently exists a distrust of authority figures, and the expectation of being hurt or exploited.[15]

## Breaking out

In 2005, a study led by psychologist Charles R. Snyder indicated that if a victim mentality sufferer forgives themself or the situation leading to that mental state, symptoms of PTSD or hostility can be mediated.[16]

For adolescent victims, group support and psychodrama techniques can help people gain a realistic view of past traumas. These techniques emphasis the victims' feelings and expressing those feelings. Support groups are useful in allowing others to practice assertiveness techniques, and warmly supporting others in the process.[17]

Successful identified techniques have included therapeutic teaching methods regarding concepts of normative decision theory, emotional intelligence, cognitive therapy, and psychological locus of control. These methods have proven helpful in allowing individuals with a victim mentality mindset to both recognize and release the mindset.[18]

# Trauma and victimhood

Trauma can undermine individual's assumptions about the world as a just and reasonable place and scientific studies have found that validation of trauma is important for therapeutic recovery. It is normal for victims to want perpetrators to take responsibility for their wrongdoing and studies conducted on patients and therapists indicate that they consider the validation of trauma and victimization as important for therapeutic recovery.[19] De Lint and Marmo identify an 'antivictimism' mentality existing within society as a whole, and those who choose to use the label victim mentality. Expecting individuals to only be "true victims" by showing fortitude and refusing to show pain, with displays of pain being seen as a sign of weakness. This will create an environment where a victim in expected to share their emotions, only to be judged or displaying them.[20]:55

Victimology has studied the perceptions of victims from sociological and psychological perspective. People who are victims of crime have a complicated relationship with the label of victim, they may feel that they are required to accept it to receive aid or for legal processes; they may feel accepting the label is necessary to avoid blame; they may want to reject it to avoid stigmatization, or give themselves a sense of agency; they may accept the label due to a desire for justice rather than sympathy. There can be a false dichotomy between the roles victim and survivor which either does not acknowledge the agency that victims exerted (for example leaving abusers) or the fact that others behaviour caused them harm.[21]

# Politics

One may consider collective victimhood in political settings. If the leaders of a country, and the citizens who support them, collectively feel like victims, those leaders may be more likely to advocate violent conflict resolution or suppression of freedom of speech.

Political psychologists Bar-Tal and Chernyak-Hai write that collective victim mentality develops from a progression of self-realization, social recognition, and eventual attempts to maintain victimhood status.[22]

# See also

- Blame
- DARVO
- Learned helplessness
- Mindset
- Moral agency
- Persecutory delusion
- Social justice warrior
- Victim blaming
- Victim complex
- Victim playing
- Victimisation

# References

1. "The Victim Mentality – What It Is & Why You Use It" (https://www.harleytherapy.co.uk/counselli ng/victim-mentality.htm). Counselling Blog. *HarleyTherapy.co.uk (Harley Therapy Ltd.- Psychotherapy & Counselling in London)*. April 26, 2016 [2006]. Retrieved August 7, 2018. Lay summary (https://www.harleytherapy.co.uk/about-us.htm).

2. Harvey, Annelie J.; Callan, Mitchell J. (July 18, 2014). "Getting "Just Deserts" or Seeing the "Silver Lining": The Relation between Judgments of Immanent and Ultimate Justice" (https://w ww.ncbi.nlm.nih.gov/pmc/articles/PMC4103766). Abstract. *PLOS ONE*. **9** (7): e101803. Bibcode:2014PLoSO...9j1803H (https://ui.adsabs.harvard.edu/abs/2014PLoSO...9j1803H). doi:10.1371/journal.pone.0101803 (https://doi.org/10.1371%2Fjournal.pone.0101803). PMC 4103766 (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4103766). PMID 25036011 (http s://pubmed.ncbi.nlm.nih.gov/25036011). "Observers engaged in more ultimate justice reasoning for a "good" victim & greater immanent justice reasoning for a "bad" victim. Participants' construals of their bad breaks varied as a function of their self-worth, w/ greater immanent justice reasoning for participants with lower self-esteem."

3. Kaminer, Wendy (July 30, 2010). "The Culture of 'Victimism' Gives Way to a Culture of Bullying" (https://www.theatlantic.com/national/archive/2010/07/the-culture-of-victimism-gives-way-to-a-c ulture-of-bullying/60643/). *The Atlantic*. Retrieved August 7, 2018.

4. Bar-Tal, Daniel; Chernyak-Hai, Lily; Schori, Noa; Gundar, Ayelet (June 2009). "A sense of self-perceived collective victimhood in intractable conflicts" (https://www.icrc.org/eng/assets/files/oth er/irrc-874-bartal-chernyakhai-schori-gundar.pdf) (PDF). Sequential stages: the process of victimization; Victim-to-victimizer cycle. *International Review of the Red Cross*. **91** (874): 234, 256. doi:10.1017/S1816383109990221 (https://doi.org/10.1017%2FS1816383109990221). Retrieved August 7, 2018. "those who perceive themselves as a victim attempt to gain social validation by persuading others (family, friends, authorities, etc.) to recognize that the harm occurred & that they are victims...the sense of collective victimhood is related to negative affective consequences of fear, reduced empathy & anger, to cognitive biases such as interpretation of ambiguous information as hostile & threatening, to emergence of the belief that violent action taken is morally justified, to reduced moral accountability & finally to a tendency to seek revenge."

5. Aquino, K.; Byron, K. (2002). "Dominating interpersonal behavior and perceived victimization in groups: Evidence for a curvilinear relationship". *Journal of Management*. **28** (1): 71. doi:10.1177/014920630202800105 (https://doi.org/10.1177%2F014920630202800105). S2CID 143406831 (https://api.semanticscholar.org/CorpusID:143406831).

6. Sykes, C. J. (1992). *A nation of victims: The decay of the American character* (https://archive.or g/details/nationofvictimsd00syke). New York: St. Martin's Press. ISBN 978-0312098827.

7. "International Review of the Red Cross: Volume 91 - War victims - Cambridge Core" (http://jour nals.cambridge.org/action/displayIssue?jid=IRC&volumeId=91&seriesId=0&issueId=874). *Cambridge Core*.

8. Coicaud, Jean-Marc (2016). "Victim Mentality & Violence: Anatomy of a Relationship" (https://b ooks.google.com/books?id=woWxDQAAQBAJ&q=%22violence+finds+itself+at+the+beginning +of+the+emergence+and+development+of+a+victim+mentality%22&pg=PA256). In Jacob, Edwin Daniel (ed.). *Rethinking Security in the Twenty-First Century: A Reader*. Palgrave Macmillan. pp. 245–264. ISBN 978-1137525413. Retrieved 2019-07-02.

9. de Vries, Manfred F.R. Kets (July 24, 2012). "Are You a Victim of the Victim Syndrome?". *Mindful Leadership Coaching*. London: INSEAD Business Press, Palgrave Macmillan. doi:10.2139/ssrn.2116238 (https://doi.org/10.2139%2Fssrn.2116238).

10. Shirin, Dr. Kim K. "The Victim Mentality" (http://www.drshirin.com/victimme.htm). *Articles. DrShirin.com*. Archived (https://web.archive.org/web/20070327185951/http://www.drshirin.com/ victimme.htm) from the original on March 27, 2007. Retrieved August 9, 2018.

11. Colier, Nancy (January 12, 2018). "Are You Ready to Stop Feeling Like a Victim?" (https://www. psychologytoday.com/ca/blog/inviting-monkey-tea/201801/are-you-ready-stop-feeling-victim). *Psychology Today*. Retrieved August 9, 2018.

12. Zitek, E. M.; Jordan, A. H.; Monin, B.; Leach, F. R. (2010). "Victim entitlement to behave selfishly" (https://pdfs.semanticscholar.org/a8a0/a24dde190b3059665183f8a184397a360d4f.pdf?_ga=2.104485251.2053359961.1552127402-717301762.1552127402) (PDF). *Journal of Personality and Social Psychology*. **98** (2): 245–55. doi:10.1037/a0017168 (https://doi.org/10.1037%2Fa0017168). PMID 20085398 (https://pubmed.ncbi.nlm.nih.gov/20085398). S2CID 9760588 (https://api.semanticscholar.org/CorpusID:9760588). Retrieved 2019-08-07.

13. Gabay, Rahav, Boaz Hameiri, Tammy Rubel-Lifschitz, and Arie Nadler. "The Tendency to Feel Victimized in Interpersonal and Intergroup Relationships." The Social Psychology of Collective Victimhood (2020): 361.

14. Braiker, Harriet B. (October 3, 2004). *Who's Pulling Your Strings? How to Break The Cycle of Manipulation*. McGraw-Hill Education. ISBN 978-0071446723.(2006)

15. Knittle, Beverly J.; Tuana, Susan J. (January 1, 1980). "Group therapy as primary treatment for adolescent victims of intrafamilial sexual abuse". Helpless Victim Mentality. *Clinical Social Work Journal*. Human Sciences Press. **8** (4): 237–238. doi:10.1007/BF00758579 (https://doi.org/10.1007%2FBF00758579). S2CID 71450173 (https://api.semanticscholar.org/CorpusID:71450173). "Therapists...have noted the long period of time needed to build a trusting relationship. There is frequently distrust of...authority figures as well as the expectation of being hurt or exploited."

16. Snyder, Charles R.; Heinze, Laura S. (April 1, 2005). "Forgiveness as a mediator of the relationship between PTSD & hostility in survivors of childhood abuse". Discussion. *Cognition and Emotion*. Taylor & Francis. **19** (3): 413–31. doi:10.1080/02699930441000175 (https://doi.org/10.1080%2F02699930441000175). PMID 22686650 (https://pubmed.ncbi.nlm.nih.gov/22686650). S2CID 1485398 (https://api.semanticscholar.org/CorpusID:1485398). "...overall forgiveness, as well as forgiveness of self and situations, mediate the PTSD-hostility relationship."

17. Knittle, Beverly J.; Tuana, Susan J. (January 1, 1980). "Group therapy as primary treatment for adolescent victims of intrafamilial sexual abuse". Helpless Victim Mentality. *Clinical Social Work Journal*. Human Sciences Press. **8** (4): 240. doi:10.1007/BF00758579 (https://doi.org/10.1007%2FBF00758579). S2CID 71450173 (https://api.semanticscholar.org/CorpusID:71450173). "The same incident would then be reenacted, only this time the victim would stop the assault by means of verbalizations, physically overpowering the offender, obtaining assistance from the other parent, or some other method. The group members develop a sense of mastery over situations in which they were once helpless. They use the group to practice assertiveness skills, and they warmly support each other in the process."

18. Danziger, Sanford (2010). "The Educational Benefits of Releasing "Victim Mentality": An Approach from the Fields of Business and Psychology" (https://search.proquest.com/openview/9766a32d3470e98b8b39bb8ea8fdfd4a/1?pq-origsite=gscholar&cbl=47765) (PDF). *Developments*. *Journal of Developmental Education*. **34** (2): 43. Retrieved August 10, 2018.

19. Kaufman, Scott Barry. "Unraveling the Mindset of Victimhood" (https://www.scientificamerican.com/article/unraveling-the-mindset-of-victimhood/). *Scientific American*. Retrieved 2020-12-31.

20. Lint, Willem de; Marmo, Marinella (2018-07-03). *Narrating Injustice Survival: Self-medication by Victims of Crime* (https://books.google.com/books?id=GetiDwAAQBAJ&newbks=0&printsec=frontcover&pg=PA55&dq=W.+de+Lint+and+M.+Marmo&q=W.+de+Lint+and+M.+Marmo&hl=en). Springer. ISBN 978-3-319-93494-5.

21. Leisenring, Amy (2006). "Confronting "Victim" Discourses: The Identity Work of Battered Women" (https://onlinelibrary.wiley.com/doi/abs/10.1525/si.2006.29.3.307). *Symbolic Interaction*. **29** (3): 307–330. doi:10.1525/si.2006.29.3.307 (https://doi.org/10.1525%2Fsi.2006.29.3.307). ISSN 1533-8665 (https://www.worldcat.org/issn/1533-8665).

22. Bar-Tal, Daniel; Chernyak-Hai, Lily; Schori, Noa; Gundar, Ayelet (June 2009). "A sense of self-perceived collective victimhood in intractable conflicts" (https://www.icrc.org/eng/assets/files/oth er/irrc-874-bartal-chernyakhai-schori-gundar.pdf) (PDF). Foundations. *International Review of the Red Cross*. **91** (874): 233. doi:10.1017/S1816383109990221 (https://doi.org/10.1017%2FS 1816383109990221). Retrieved August 21, 2018→ Sense of Victimhood has 3 foundations: (1) rooted in a Realization of Harm Experienced either directly or indirectly (2) 'Victim': a social label → result of Social Recognition of an act as illegitimate harm (3) Individuals Perceive Themselves as Victims → often attempt to maintain this status

# Bibliography

- Caroline M Luke Butiz Butera (2010). The causes, prevalence, and treatment of obesity revisited in 2009: what have we learned so far? American Journal of Clinical Nutrition, 91, 277S-279S.
- Christopher Peterson (2006). A Primer in Positive Psychology. Oxford University Press.
- Thomas J. Nevitt: The Victim Mentality. https://web.archive.org/web/20121014034523/http://aaph.org/node/214

Retrieved from "https://en.wikipedia.org/w/index.php?title=Victim_mentality&oldid=1019340242"

This page was last edited on 22 April 2021, at 19:48 (UTC).

Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

Images are still loading. Please cancel your print and try again.

Litigation Abuse | WomensLaw.org

WomensLaw is not just for women. We serve and support all survivors, no matter their sex or gender.

**CloseClose**

**Important:** Even if courts are closed, you can still file for a protection order and other emergency relief. See our **FAQ on Courts and COVID-19**.

**CloseClose**



## About Abuse

# Litigation Abuse

Updated: September 4, 2019

Once someone separates from an abusive spouse/partner, the abuser may try to keep power and control over the victim by misusing the court system against the victim. For example, filing repeated petitions or motions, requesting many adjournments, appealing the judge's orders without a legal basis to do so, or taking other actions that make the victim repeatedly come to court. Sometimes this type of behavior is called "litigation abuse."

Unfortunately, litigation abuse is challenging to deal with because it is hard to limit someone's right to file in court. If you are facing litigation abuse, you may want to try proving to the judge that the cases the abuser keeps bringing are not based on a good reason (without merit) and are filed instead to harass you. Sometimes, a judge may issue an order that will help to limit the litigation abuse or its effects by:

- ordering the party bringing the excessive motions to pay your court costs and attorney's fees;
- ordering the party who files meaningless motions to reimburse your lost wages and other expenses caused by having to repeatedly come to court;
- excusing you from appearing at court hearings or letting you appear by telephone;
- ordering that no motions or petitions can be filed, or that no court appearances may be scheduled, without the judge's prior approval; or
- denying adjournment requests for excessive or unnecessary delay.

Litigation abuse often takes place in divorces or other complex court cases that allow discovery, which is the exchange of documents and information between the parties before trial. To read more about litigation abuse during the discovery process, go to **What if the abuser is using discovery as an abuse tactic?** in our **Preparing for Court - By Yourself** section.

Another possible way that you may prevent an abuser from continuing to take you to court is by filing a motion asking that the abuser be ordered to pay your attorney's fees each and every time the abuser loses the motion, petition, or other case brought against you. Sometimes, this sort of financial penalty can be enough of an incentive to discourage multiple lawsuits. Hopefully a lawyer can walk you through the process of filing such a motion to the judge to make these sort of requests, if this is something you want to do.

We link to free and paid lawyers on our **Finding a Lawyer** page if you want to get specific advice about your situation.

Did you find this information helpful?

**Yes**   **No**

© 2008–2020 WomensLaw.org is a project of the National Network to End Domestic Violence, Inc. All rights reserved. This website is funded in part through a grant from the Office for Victims of Crime, Office of Justice Programs, U.S. Department of Justice. Neither the U.S. Department of Justice nor any of its components operate, control, are responsible for, or necessarily endorse, this website (including, without limitation, its content, technical infrastructure, and policies, and any services or tools provided). NNEDV is a 501©(3) non-profit organization; EIN 52-1973408.

2021/5/29                                    Litigation Abuse | WomensLaw.org



# PIRO ZINNA CIFELLI PARIS & GENITEMPO LLC

## ATTORNEYS AT LAW

973-542-2766

 973-542-2766

2021/5/29 Love, lies and…fraud? Understanding civil fraud lawsuits | Pirozzolo Law, LLC

Case 2:21-cv-01316-MJP   Document 1-3   Filed 09/27/21   Page 59 of 74

Comprehensive Legal Services From An Esteemed Firm

The experience you need to get the results you want.

# Love, lies and…fraud? Understanding civil fraud lawsuits

Fraud can be either a criminal or civil matter — or even both — depending on the circumstances and parties involved. However, just because someone feels deceived, that doesn't necessarily rise to the level of legal fraud.

Take, for example, the recent lawsuit filed by a jilted lover after his girlfriend eventually rejected him and moved on to another. In response, the man filed a civil lawsuit, alleging a type of fraud known as "false

representation."

Essentially, his complaint alleged that he'd spent a considerable amount of money on her over their year-long romance with the expectation that they would eventually be a permanent couple — despite the fact that they were both married to other people (a fact the woman was open about but he somehow neglected to mention).

Legal fraud by false representation is [essentially a lie](https://www.pirozinnalaw.com/blog/2017/08/love-lies-andfraud-understanding-civil-fraud-lawsuits) designed to get something out of someone else. A person who relies on that false representation to his or her detriment may have a valid personal injury claim if:

- The lie was either intentional or the result of willful ignorance
- The person telling the lie fully intended it to be taken seriously and wanted the listener to believe it was the truth
- The lie caused true physical or financial harm.

While emotional losses may eventually figure into any compensation, emotional losses alone aren't usually enough for a successful civil lawsuit.

In the case mentioned above, it seems clear that the woman was honest about her interest in the man at the time. Although he did spend a lot of money on gifts and trips for her, she was hesitant to accept and he frequently insisted that the money wasn't much to him because of his level of wealth. He referred to the thousands of dollars he'd spent as "pennies" in his mind.

When their relationship soured, the woman didn't continue to tell him she was still in love — she quickly broke it off. Additionally, she ultimately did end her marriage and move on — just with someone else.

Rather predictably, the court rejected the jilted lover's lawsuit and his appeal. However, there's as much to be learned from failed lawsuits as there are from those that are successful. Understanding why a personal injury lawsuit doesn't succeed can help you avoid the same errors.

A personal injury attorney can help you if you've been the victim of fraud.

**Source:** CityPages, "Jilted Minnesota man sues ex-girlfriend for 'fraud' after paying for trips to Vegas, Cancun," Susan Du, Aug. 23, 2017

Facebook          Twitter          LinkedIn

## CATEGORIES

Blog (2)

Divorce (2)

Estate Planning (10)

Firm News (9)

Injuries (1)

Medical Malpractice (2)

Personal Injury (58)

Sexual Harassment (1)

Sexual Harassment (64)

Workplace Discrimination (3)

Workplace Discrimination (76)

Wrongful Termination (56)

## ARCHIVES

April 2021 (1)

[February 2021 (3)](#)
[January 2021 (2)](#)
[November 2020 (2)](#)
[October 2020 (2)](#)
[September 2020 (2)](#)
[June 2020 (3)](#)
[May 2020 (1)](#)
[April 2020 (2)](#)
[February 2020 (1)](#)
[January 2020 (1)](#)
[September 2019 (4)](#)
[August 2019 (5)](#)
[July 2019 (5)](#)
[June 2019 (4)](#)
[May 2019 (4)](#)
[April 2019 (6)](#)
[March 2019 (4)](#)
[February 2019 (4)](#)
[January 2019 (6)](#)
[December 2018 (4)](#)
[November 2018 (5)](#)
[October 2018 (5)](#)
[September 2018 (4)](#)
[August 2018 (5)](#)
[July 2018 (5)](#)
[June 2018 (5)](#)
[May 2018 (5)](#)
[April 2018 (4)](#)

[March 2018 (4)](#)

[February 2018 (5)](#)

[January 2018 (5)](#)

[December 2017 (5)](#)

[November 2017 (5)](#)

[October 2017 (4)](#)

[September 2017 (4)](#)

[August 2017 (6)](#)

[July 2017 (4)](#)

[June 2017 (5)](#)

[May 2017 (5)](#)

[April 2017 (4)](#)

[March 2017 (5)](#)

[February 2017 (5)](#)

[January 2017 (6)](#)

[December 2016 (4)](#)

[November 2016 (4)](#)

[October 2016 (2)](#)

[September 2016 (2)](#)

[August 2016 (2)](#)

[July 2016 (2)](#)

[June 2016 (3)](#)

[May 2016 (2)](#)

[April 2016 (2)](#)

[March 2016 (2)](#)

[February 2016 (2)](#)

[January 2016 (3)](#)

[December 2015 (2)](#)

[November 2015 (2)](#)

[October 2015 (3)](#)

[September 2015 (2)](#)

[August 2015 (2)](#)

[July 2015 (2)](#)

[June 2015 (2)](#)

[May 2015 (2)](#)

[April 2015 (3)](#)

[March 2015 (2)](#)

[February 2015 (2)](#)

[January 2015 (3)](#)

[December 2014 (2)](#)

[November 2014 (2)](#)

[October 2014 (3)](#)

[September 2014 (2)](#)

[August 2014 (2)](#)

[July 2014 (2)](#)

[June 2014 (2)](#)

[May 2014 (3)](#)

[April 2014 (2)](#)

[March 2014 (2)](#)

[February 2014 (2)](#)

[January 2014 (2)](#)

[December 2013 (2)](#)

[November 2013 (3)](#)

[October 2013 (4)](#)

[September 2013 (2)](#)

[August 2013 (2)](#)

[July 2013 (3)](#)

[June 2013 (1)](#)

[April 2013 (2)](#)

[March 2013 (2)](#)

[February 2013 (2)](#)

[January 2013 (3)](#)

## RECENT POSTS

[Piro Zinna Lawyers Named 2021 Super Lawyers and Rising Star](#)

[What does the recent SCOTUS ruling mean for New Jersey workers?](#)

[Planning to create a will? Here's where to start.](#)

[Piro Zinna Attorney Wins Case before New Jersey Supreme Court: A Victory for the Good Samaritan Employee](#)

[Reasonable accommodations: What workers must know](#)

[Subscribe To This Blog's Feed](#)

## Verdicts & Settlements

[Read More](#)

*See methodology for inclusion at the websites listed: Best Lawyers® Best Law Firm News, Martindale-Hubbelland Super Lawyers. No aspect of this advertisement has been approved by the Supreme Court of New Jersey.

# Make The Smart Choice: Contact Us Today.



✉ Email Us For A Response

## Don't Take Chances Choosing A Lawyer.
## Call Our Trusted Team Today: 973-542-2766.

# Centrally Located

Our Essex County office is situated conveniently close to the courts of the seven northernmost counties of New Jersey.

## Our Office

360 Passaic Avenue

Nutley, NJ 07110

Phone: 973-542-2766

Fax: 973-661-5157

[Nutley Law Office Map](#)

REVIEW US



Piro Zinna Cifelli Paris & Genitempo LLC is a law firm located in Nutley, New Jersey.

© 2021 Piro Zinna Cifelli Paris & Genitempo LLC. All Rights Reserved.

Disclaimer | Site Map | Privacy Policy | Business Development Solutions by FindLaw, part of Thomson Reuters

WIKIPEDIA

# Emotional blackmail

**Emotional blackmail** and **FOG** are terms, popularized by psychotherapist Susan Forward, about controlling people in relationships and the theory that fear, obligation and guilt (FOG) are the transactional dynamics at play between the controller and the person being controlled. Understanding these dynamics is useful to anyone trying to extricate oneself from the controlling behavior of another person and deal with their own compulsions to do things that are uncomfortable, undesirable, burdensome, or self-sacrificing for others.[1]

## Contents

General

Types

Patterns and characteristics

    Addictions

    Mental illness

    Codependency

    Affluenza and children

    Assertiveness training

Recovery

Cultural examples

Criticism

See also

References

## General

The first documented use of "emotional blackmail" appeared in 1947 in the *Journal of the National Association of Deans of Women* in the article "Emotional Blackmail Climate". The term was used to describe one type of problematic classroom control model often used by teachers.[2] Esther Vilar, an Argentine physician, also used the term "emotional blackmail" in the early 1970s to describe a parenting strategy observed among some mothers with multiple children.[3]

Emotional blackmail typically involves two people who have established a close personal or intimate relationship (parent and child, spouses, siblings, or two close friends).[4] Children, too, will employ special pleading and emotional blackmail to promote their own interests, and self-development, within the family system.[5]

Emotional blackmailers use fear, obligation and guilt in their relationships, ensuring that others feel afraid to cross them, obligated to give them their way and swamped by guilt if they resist. Knowing that someone close to them wants love, approval or confirmation of identity and self-esteem, blackmailers may threaten to withhold them (e.g., withhold love) or take them away altogether, making the second person feel they must earn them by agreement.[6] Fear, obligation or guilt is commonly referred to as "FOG". FOG is a contrived acronym—a play on the word "fog" which describes something that obscures and confuses a situation or someone's thought processes.

The person who is acting in a controlling way often wants something from the other person that is legitimate to want. They may want to feel loved, safe, valuable, appreciated, supported, needed, etc. This is not the problem. The problem is often more a matter of how they are going about getting what they want, or that they are insensitive to others' needs in doing so that is troubling—and how others react to all of this.[1]

Under pressure, one may become a sort of hostage, forced to act under pressure of the threat of responsibility for the other's breakdown.[7] One could fall into a pattern of letting the blackmailer control his/her decisions and behavior, lost in what Doris Lessing described as "a sort of psychological fog".[8]

# Types

Forward and Frazier identify four blackmail types each with their own mental manipulation style:[9]

| Type | Example |
| --- | --- |
| **Punisher's threat** | Eat the food I cooked for you or I'll hurt you. |
| **Self-punisher's threat** | Eat the food I cooked for you or I'll hurt myself. |
| **Sufferer's threat** | Eat the food I cooked for you. I was saving it for myself. I wonder what will happen now. |
| **Tantalizer's threat** | Eat the food I cooked for you and you just may get a really yummy dessert. |

There are different levels of demands—demands that are of little consequence, demands that involve important issues or personal integrity, demands that affect major life decisions, and/or demands that are dangerous or illegal.[1]

# Patterns and characteristics

## Addictions

Addicts often believe that being in control is how to achieve success and happiness in life. People who follow this rule use it as a survival skill, having usually learned it in childhood. As long as they make the rules, no one can back them into a corner with their feelings.[10]

## Mental illness

People with certain mental conditions are predisposed to controlling behavior including those with paranoid personality disorder,[11] borderline personality disorder,[12] and narcissistic personality disorder.[13]

People with borderline personality disorder are particularly likely to use emotional blackmail[12] (as too are destructive narcissists).[13] However, their actions may be impulsive and driven by fear and a desperate sense of hopelessness, rather than being the product of any conscious plan.[14]

## Codependency

Codependency often involves placing a lower priority on one's own needs, while being excessively preoccupied with the needs of others. Codependency can occur in any type of relationship, including family, work, friendship, and also romantic, peer or community relationships.[15]

## Affluenza and children

Affluenza—the status insecurity derived from obsessively keeping up with the Joneses—has been linked by Oliver James to a pattern of childhood training whereby sufferers were "subjected to a form of emotional blackmail as toddlers. Their mothers' love becomes conditional on exhibiting behaviour that achieved parental goals."[16]

## Assertiveness training

Assertiveness training encourages people to not engage in fruitless back-and-forths or power struggles with the emotional blackmailer but instead to repeat a neutral statement, such as "I can see how you feel that way," or, if pressured to eat, say "No thank you, I'm not hungry." They are taught to keep their statements within certain boundaries in order not to capitulate to coercive nagging, emotional blackmail, or

bullying.[17]

# Recovery

抵制情感敲诈的技巧包括加强人际界限，抵制需求，制定权力声明（决心承受压力）以及花时间打破旧模式。重新连接勒索者已否决的自我自治部分不一定很容易。[9]即使您承认内as是诱发性和非理性的，也可能基于情感敲诈而感到内;[18]但仍然能够抵制过度补偿，并忽略勒索者发脾气而引起注意的企图。[19]

但是，以友好的方式始终不理会这种操纵可能会导致操纵的加剧和分离的威胁，[20]或被指控为"疯狂"或"家庭破坏者"。[9]

## 文化实例

- 安吉拉·卡特（Angela Carter）将《美女与野兽》描述为美化了野兽方面的情感敲诈，以此来控制自己的目标美女。[21]
- 小说家多丽丝·莱辛（Doris Lessing）声称："到五岁时，我就成为了勒索的专家。"[22]

## 批评

丹尼尔·米勒（Daniel Miller）反对，在通俗心理学中，情感勒索的想法已被滥用为抵制任何形式的同情或对他人的考虑的辩护。[23]

用诸如"勒索"和"操纵"之类的煽动性术语来标记这种动态可能没有什么用处，因为它既是两极分化的，又意味着预谋和恶意，通常不是这种情况。控制行为和被控制是两个人之间的交易，两者都在起作用。[1]

## 另请参阅

- 滥用权力与控制权
- 诉诸情感
- 相互依存
- 强制说服
- 双重约束
- 家庭关系
- 内trip之旅
- 智力游戏
- 劝说
- 惩罚（心理学）

## 参考

1. Johnson，R.Skip（2014年8月16日）。"情感敲诈：恐惧，义务和罪恶（FOG）"（http://bpdfamily.com/content/emotion al-blackmail-fear-obligation-and-guilt-fog）。BPDFamily.com。于2014年10月18日检索。

2. "未知"。全国妇女院长协会会学报。11-12：10。1947年。引用使用通用标题（帮助）

3. "为了使顺服灌输给独生子女，母亲必须发展复杂的方法以使其聪明并说服它，并使其明白原因；否则就必须受到惩罚。由于这是令人讨厌的事情，母亲通常将其留给父亲。另一方面，可以通过情感敲诈来训练几个孩子，因为它们都取决于母亲的同意，所以她只需要稍微偏爱一个孩子，其他孩子就会做任何她告诉他们的事情。一直担心它的母亲会"撤回"她的爱，并把爱交给别人。"比利亚尔，埃丝特（1972）。被操纵的人，矮脚鸡/法拉尔，施特劳斯和吉鲁公司

4. Stanlee Phelps / Nancy Austin，《自信的女人》（1987）p. 133

5. Nigel Rapport编辑，英国主题（Oxford 2002）p. 141

6. Gavin Miller，RD Laing（2004）p. 52

7. 吉恩·鲍德里亚，水晶的复仇 (https://books.google.com/books?id=lKvjtv31AqoC&pg=PA174&lpg=PA174)（1999）p. 174

8. Doris Lessing，金黄笔记本（1973）p. 554

9. 苏珊·前进（Susan Forward）/唐娜·弗雷泽（Donna Frazier），《情感敲诈》（伦敦，1997年）p. 28、82、145、169

10. Fenley，Jr.，James L.在痛苦中寻找目的（2012）

11. Goldberg，MD，Joseph（2014年5月23日）。"偏执型人格障碍" (http://webmd.com/mental-health/paranoid-personality-disorder)。于2014年10月20日检索。 (http://webmd.com/mental-health/paranoid-personality-disorder)

12. Braiker，Harriet B.，谁在拉弦乐？如何打破操纵周期（2006）

13. 妮娜·布朗（Nina W.Brown），《自我吸收的孩子》（Children of the Self-Absorbed）（2008）35

14. Blaise A. Aguirre，《青少年人际交往性障碍》（2007年），第3页。73-4

15. Codepends Anonymous：模式和特性 (http://www.coda.org/tools4recovery/Patterns2-2011.htm) 存档于 (https://web.archive.org/web/20130824075736/http://www.coda.org/tools4recovery/Patterns2-2011.htm)2013-08-24，在Wayback Machine上

16. 奥利弗詹姆斯，长沙发上的英国（伦敦1998）p. 66

17. Sue Bishop，《发展你的自信》（2006年），第3页。13

18. 玛丽·巴恩斯和约瑟夫·伯克，玛丽·巴恩斯（1974）p. 284

19. 卡尔·罗杰斯（Carl Rogers），《成为一个人》（1961）。320

20. 罗宾·斯金纳/约翰·克莱斯（John Cleese），《生活以及如何生存》（伦敦1993）p. 349和p. 352

21. 艾登天，安吉拉卡特：理性玻璃（1998）p. 138

22. 盖尔，绿色，多丽丝·莱辛：变化的诗学（1997）p. 9

23. 丹尼尔·米勒，事的舒适 (https://books.google.com/books?id=yxkrED7hVuIC&pg=PA41&lpg=PA41)（2008）p. 41

Retrieved from "https://en.wikipedia.org/w/index.php?title=Emotional_blackmail&oldid=996249463"

This page was last edited on 25 December 2020, at 12:20 (UTC).

Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.